[No. C055139. Third Dist. Mar. 30, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH TERRELL JOHNSON et al., Defendants and Appellants.

COUNSEL

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Joseph Terrell Johnson.

Madeline McDowell, under appointment by the Court of Appeal, for Defendant and Appellant Jessica Nicole Holmes.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**NICHOLSON, J.**—During a two-week period in 2005, defendants Joseph Terrell Johnson and Jessica Nicole Holmes, along with Holmes's boyfriend, Corey Schroeder, robbed or attempted to rob at least five gas stations in the Sacramento area. Their mode of operation was virtually the same for each robbery: Schroeder would case the station, Johnson would rob the station attendant at gunpoint, and Holmes would drive them away. On the trio's last attempted robbery, Johnson shot and killed the station attendant, Prem Chetty.

Separate juries convicted Johnson and Holmes of murder during the commission of an attempted robbery, and multiple counts of second degree robbery and attempted second degree robbery. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17), 211, 664.) They also found true gun-use enhancements and principal-armed enhancements as to each count. (Pen. Code, §§ 12022, subd. (a)(1), 12022.53, subds. (b), (d).)[1]

The trial court sentenced Johnson to a prison term of life without the possibility of parole for the special circumstance murder, an additional 25 years to life for the firearm enhancement attached to the murder conviction, and an additional consecutive determinate term of 34 years four months for the remaining convictions and enhancements.

The trial court sentenced Holmes also to a prison term of life without the possibility of parole for the special circumstance murder, an additional 25 years to life for the firearm enhancements attached to the murder conviction, and an additional consecutive term of seven years eight months for the remaining convictions and enhancements.

Both defendants appeal. Johnson claims the trial court erred when it:

(1) Determined the pretrial and in-court identification procedures used by the police and the prosecution were not unduly suggestive;

(2) Ruled that evidence of an uncharged robbery that Johnson sought to introduce to show third party culpability was inadmissible under Evidence Code section 352 where the court relied on his confession to that robbery which was suppressed under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*); and

(3) Ruled that evidence of an exculpatory statement purportedly made by Johnson to a girlfriend did not qualify for admission under Evidence Code section 356.

---

[1] The information also charged Schroeder, but his trial was severed from defendants' trial.

Johnson also asserts cumulative constitutional error, and a sentencing error for not receiving any custody credit.

Defendant Holmes claims the trial court erred by:

(1) Refusing to suppress confessions Holmes made to police while in custody allegedly in violation of her *Miranda* rights; and

(2) Imposing cruel and/or unusual punishment in violation of her federal and state constitutional rights.

Holmes also asserts sentencing error for not receiving any custody credit.

Except to modify the judgments to award custody credit to each defendant, and to correct Holmes's abstract of judgment, we affirm.

## FACTS

*June 25, 2005 Robbery at L&S Shell Gas Station, Madison Avenue and Auburn Boulevard (Count Three—Johnson only)*

About 11:20 a.m. on June 25, 2005, Johnson entered the automotive repair store adjacent to the L&S Shell gas station. Timothy Meton was working as the cashier. After the other customers left, Johnson pulled a gun from his waistband and demanded Meton give him "all the money."

As Meton took the money out of the cash register, Johnson "gestured" with the gun and told him to "[h]urry up." Meton gave Johnson all of the cash in the tray. Johnson told Meton to give him the money underneath the tray. Meton showed Johnson there was no money underneath the tray. Johnson stuffed the money into the front pocket of his sweatshirt and ran out the door toward a McDonald's restaurant located across the street. Meton estimated he gave Johnson about $700.

Meton participated in two lineups. The first, on July 10, 2005, was a photographic lineup that included Johnson. Meton did not identify anyone. The second, on July 15, 2005, was a live lineup. Meton requested the individuals each say "hurry up" and "underneath too." He identified Johnson after hearing the individuals speak. Johnson was the only person who was in both the photographic lineup and the live lineup.

Meton also identified Johnson in court as the robber.

Holmes's jury heard Holmes's July 11, 2005 interview with Sacramento County Sheriff's detectives. Regarding this robbery, Holmes stated Johnson had called her and asked her to pick him up. She, Schroeder, and another girl did so. Johnson directed Holmes to park at the McDonald's, and he went across the street to the Shell station. After he came back from the Shell station, he said, "Let's leave." After they drove out of the parking lot, Johnson told Holmes he had robbed the station. Holmes knew Johnson had a gun with him. She drove Johnson to another location, and he gave her $20 for the ride.

### June 28, 2005 Robbery at Arco Gas Station, Walerga Road and Hillsdale Boulevard (Count Four—Johnson and Holmes)

On June 28, 2005, Kuljit Rai was working alone at his Arco gas station on the corner of Walerga Road and Hillsdale Boulevard in Sacramento County. About 2:00 p.m., Johnson entered the store and robbed Rai at gunpoint of about $75. After Johnson ran out, Rai followed him and saw Johnson get into the back passenger seat of a small, white, four-door car. Rai could not see anyone else in the car.

The store's surveillance tape showed a White male in a white tank top enter the store. The tape also shows Johnson entering the store.

On July 15, 2009, Rai identified Johnson at a live lineup as the robber. Rai also identified Johnson in court as the robber.

During closing arguments, Johnson conceded his guilt to this crime.

### June 28, 2005 Attempted Robbery of Shell Gas Station, Auburn Boulevard and Antelope Road (Count Five—Johnson and Holmes)

About 30 minutes after the Arco robbery, Johnson attempted to rob a Shell gas station at the corner of Auburn Boulevard and Antelope Road in Citrus Heights. Ewa Her was working at that station when, about 2:30 p.m., he heard a voice behind him coming from the cash register counter. He turned around and saw Johnson standing at the counter and pointing a gun at him. Johnson repeatedly demanded that Her give him the money. When Her did not, Johnson put his hand on top of the gun and pulled back the slide. Her "freaked out" and ran to the back room. He never gave Johnson any money.

About a minute before Johnson came into the store, a White man in a white tank top came into the store and purchased a soda and some chips. Her did not attend a live lineup and he did not identify Johnson at trial.

There were two minors in the store at the time of the robbery. One of the minors saw Johnson put a glove on his right hand and possibly his left, pull a gun out, and heard him tell the clerk to give him money. The minors both identified Johnson at a live lineup and at trial as the robber.

Holmes's jury heard Holmes's statement that she had driven Johnson to this gas station, and she drove away after Johnson came back from the store.

During closing argument, Johnson conceded his guilt to this count.

*June 30, 2005 Robbery of Arco/Valero Gas Station at San Juan Avenue and Winding Way (Count Nine—Evidence Presented to Holmes's Jury Only)*

Thomas Claussen was working alone the evening of June 30, 2005, at the Arco/Valero gas station at San Juan Avenue and Winding Way.[2] A tall, Black male entered the store. The man was slim, about 18 years old, wearing a blue Kobe Bryant jersey, a black baseball hat, and a glove on his hand. The man aimed his gun at Claussen and demanded money. Claussen gave the man all of the money in the cash drawer, about $130. After the robber left, Claussen went outside, but he could not see the man. Claussen saw a maroon pickup truck leave the area, but he did not know if the truck was related to the robbery.

Claussen attended a live lineup that included Johnson. However, Claussen was unable to identify anyone as the robber of his store. On the sheriff's department lineup identification form, Claussen wrote that the robber was darker skinned than any of the lineup participants.

Holmes told detectives she drove Johnson to the Arco/Valero station. Johnson told her where to park. Johnson went into a nearby liquor store and then went into the Arco/Valero station. Johnson said nothing about a robbery when he came back to the car. Holmes did not know Johnson had robbed the station until a couple of days later.

Deputies later seized a Kobe Bryant jersey from the home where Johnson had been living. Johnson appears to be wearing the same jersey in a DMV photo.

As to Holmes, the court declared a mistrial on this count after her jury announced it was deadlocked. The prosecutor subsequently moved to dismiss the charge, and the court granted the motion.

---

[2] The Attorney General refers to the station both as an Arco station and as a Valero station. Claussen testified he worked for Valero but the station was branded as an Arco station. To avoid confusion, we will refer to it as an Arco/Valero station.

*June 30, 2005 Robbery of Chevron Gas Station at Dewey Drive and Madison Avenue (Count Six—Johnson and Holmes)*

Also on June 30, 2005, about 8:20 p.m., Johnson entered a Chevron gas station on the corner of Dewey Drive and Madison Avenue, walked to the counter, pointed a gun at the employee, Jesus Fernandez, and demanded all the money. Fernandez put all of the money from the cash register, between $250 and $300, into a bag and gave it to Johnson. Johnson left the store and went behind a building.

On July 21, 2005, Detective Biondi showed Fernandez surveillance images from the robbery, and then showed him a photographic lineup. Fernandez identified himself and the robber in the surveillance images. Then, when viewing the photographs, Fernandez first pointed to Johnson and another person, but then he identified Johnson as the robber. Fernandez did not attend a live lineup. He identified Johnson in court as the robber.

As to Holmes, the court declared a mistrial on this count after her jury announced it was deadlocked. The court later granted the prosecution's motion to dismiss the charge against Holmes.

*July 5, 2005 Uncharged Robbery in Roseville*

Shortly before 7:00 p.m., July 5, 2005, Johnson walked into a Valero gas station at Sunrise Avenue and Coloma Road in Roseville. He picked up a soda, walked to the counter, pointed a gun at the employee, Rui Mar, and demanded she give him money from the cash register. Mar told Johnson she could not open the register unless he purchased something. Johnson continued pointing the gun at Mar and threatening her. She tried to hide behind an ice machine next to the register. Johnson fired two shots and left.

Officers found two bullet holes behind the counter area. One .380-caliber bullet was found inside cigarette packs stored behind the register. Two .380-caliber shell casings were also found. Surveillance video taken from the store showed a man in a white tank top inside the store before the robber entered the store.

On July 8, 2005, at the request of a Roseville police sergeant, Mar viewed a media release and still photos posted on the Sacramento County Sheriff's Department Web site regarding a July 7 murder in Citrus Heights. Mar informed the officer the person in the still photos was the same person who had attempted to rob her.

On July 15, 2005, Mar attended a live lineup in Sacramento County. She quickly identified Johnson from the lineup as the robber. Later, Mar identified Johnson in court as the robber.

Holmes's jury heard Holmes's statement to detectives that she drove Johnson to the Valero station in Roseville. Schroeder went into the store to buy Holmes a soda. Then Johnson went inside and came back with a soda. Holmes had the radio on and did not hear any gunshots. Johnson and Schroeder talked about Johnson shooting at the clerk. Johnson said he had "shot right next to her."

Holmes denied she had known Johnson was going to commit a robbery. She claimed she drove and parked wherever Johnson told her because "he needed [her] to take him." She thought she was taking Johnson to buy marijuana.

*July 5, 2005 Robbery of Chevron Gas Station at Walnut Avenue and Marconi Avenue (Counts Seven and Eight—Johnson and Holmes)*

About 30 minutes after the uncharged Roseville robbery, Johnson walked into a Chevron gas station store at Walnut Avenue and Marconi Avenue in Sacramento County. He picked up a container of milk and a bag of chips, walked to the counter, and asked the employee, Mathew Johnson, for a cigar. Mathew turned around to get the cigar, and when he turned back around, Johnson was pointing a gun at him. Johnson threatened to shoot unless Mathew gave him the money from the register. As Mathew pulled the tray out of the register, another station employee, Lidia Fretwell, entered the store from the outside. Mathew told Fretwell they were being robbed. He tried to give Johnson the tray, but Johnson refused to touch it. He ordered Mathew to remove the money and give it to him. Mathew gave him about $170. Johnson took the money and left.

Mathew followed Johnson outside and saw Johnson get into a white compact car, possibly a Ford Escort, behind the station. He could not see if anyone else was in the car. At trial, Mathew testified that Corey Schroeder, a man he knew from his apartment complex, had come into the store about one hour before the robbery and had bought a pack of cigarettes.

A customer, Corrine Kelly, entered the store as a Black man exited the store holding a Nestle Nesquik. Kelly saw the man walk to an adjacent parking lot and get into a white or beige Ford Escort occupied by two other people.

Mathew identified Schroeder and Johnson in separate live lineups; Schroeder as the man who came into the store an hour before the robbery, and Johnson as the robber. Mathew also identified Johnson as the robber at trial.

Fretwell identified Johnson as the robber from a photographic lineup. She also identified Johnson at trial as the robber after she looked at the photo she had previously identified. She did not attend a live lineup.

Holmes's jury heard Holmes's statement to detectives that she had driven Johnson to the Chevron station. He told her to park behind the gas station. Schroeder went into the store first to buy fireworks, she thought. When Schroeder came back, Johnson asked him how many people were working inside the store. Johnson told Holmes he had to get something and got out of the car. Holmes drove away after Johnson came back. Later, Johnson told her he had robbed the store.

*July 5, 2005 Purchase of Bullets at Big 5*

About 8:00 p.m. on July 5, 2005, the evening of the Chevron gas station robbery and the uncharged Roseville robbery, Johnson, Holmes, Schroeder, and an unidentified Black male purchased ammunition at a Big 5 Sporting Goods store on Arden Way near Watt Avenue. They bought a box of Remington .380-caliber bullets with cash. Video from the store's surveillance system shows the four people all standing by the ammunition counter at one point. Schroeder is wearing a white tank top.

Holmes's jury also heard Holmes's statement to detectives that she had driven Johnson to Big 5 to buy bullets. She denied knowing what Johnson intended to do with them. Holmes's sister's ex-boyfriend went with them to buy the bullets.

*July 7, 2005 Murder and Attempted Robbery at Shell Gas Station at Greenback Lane and Auburn Boulevard (Counts One and Two—Johnson and Holmes)*

On July 7, 2005, Prem Chetty was working at a Shell station at Greenback Lane and Auburn Boulevard in Citrus Heights. He was killed that evening in an attempted robbery.

Surveillance videotape from the station recorded a Black man wearing a gray sweatshirt and a black cap take something out of one of the store's coolers. He walked up to the store's counter where Chetty was waiting. The man picked up another item to buy, and then handed Chetty some money. When Chetty opened the cash register drawer, the man pulled a gun on Chetty and demanded the money. When Chetty did not give the robber any money, the man shot Chetty more than once and then left the store. Chetty died of gunshot wounds to the neck and chest.

The video also appears to portray Schroeder wearing a red shirt inside the store prior to the robbery.

Three witnesses who were in the vicinity of the Shell station at the time of the murder testified. Kimberly Irvine was at the Chevron station across the street when she heard a couple of gunshots. She looked toward the Shell station and saw a man wearing dark clothing run out of the store and toward the fence and bushes that divided the Shell station from a Jack in the Box restaurant. The man ran out of view and she did not see where he went.

Dee Scott-Chee and Carol Webber were in a car stopped at the traffic light at Greenback Lane and Auburn Boulevard when Chee heard two gunshots. She saw a person run quickly from the Shell station into the bushes dividing the station and the Jack in the Box.

Webber stated she saw the face of the man leaving the station. At a photo lineup, Webber selected the photograph of Johnson's cousin, Thaddeus Taylor, as the person who looked "the closest in the eyes." Later, at a subsequent photo lineup, Webber again did not select Johnson as the man she saw.

Randy Cockrell was sitting inside his car with his girlfriend at the Gold's Gym parking lot near Greenback Lane and Auburn Boulevard when he heard two gunshots. He looked in his rearview mirror and saw a White male run from the Shell station toward a white, four-door sedan that was parked behind the Jack in the Box. The sedan drove onto Greenback Lane toward the freeway.

Deputies recovered three spent shell casings and two deformed copper-jacketed bullets from the scene. The casings were each marked with a head stamp of "R-P .380 auto."

Holmes's jury heard her statement to detectives in which she admitted driving Johnson to the Shell station. She drove a white, 1994 Ford Escort, which was registered in her mother's name. She had picked Johnson up at the home of his cousin, Thaddeus Taylor, with whom he had been living. Johnson told Holmes he wanted to "get something," so Holmes stopped at the Shell station. Johnson told her to park by the fence between the station and the Jack in the Box. Johnson got out of the car with Schroeder. Schroeder went inside the store to buy cigarettes. He returned to the car and told Johnson and Holmes he could not buy them because the store clerk had asked him for identification.

Holmes stated Johnson either went through a hole in the fence or jumped the fence to get to the station. Holmes heard three gunshots. Johnson came

back to the car and got in the backseat. After they drove away, Johnson told Holmes and Schroeder that he had "tried to rob" the clerk and had shot him. Neither Holmes nor Schroeder believed him. Holmes told the detectives she did not know about the murder until the day of her interview.

Johnson had two girlfriends, Chelsea Ciscoe and Natalie Brand, with whom he spent time after the murder and prior to his arrest. He admitted the murder to both women. Chelsea told detectives that Johnson told her the clerk at the Shell station had reached for Johnson's gun and Johnson "freaked out." Johnson said the clerk was going for the gun and Johnson thought he might be shot. Johnson told Chelsea he "blinked" and the whole incident was over.

Natalie told detectives that Johnson had admitted he killed the clerk. Johnson told Natalie that he went to rob the clerk, but he did not mean to shoot and kill him. The clerk had grabbed for the gun, Johnson had been scared, and he fired the gun. Johnson told Natalie that he had gone to do the robbery because his uncle with whom he had been living had kicked him out of the house. Natalie recanted her statements at trial.

Detectives searched the bedroom Johnson shared with his cousin, Thaddeus Taylor. Thaddeus directed detectives to a speaker box. Inside, detectives found a Beretta model 84, nine-millimeter handgun.[3] There was a live round inside the chamber and nine live rounds in the magazine. Detectives also found a box of Remington .380-caliber ammunition from Big 5. Inside the box were 44 .380-caliber round-nose bullets and three .380-caliber hollow-point bullets. The box had empty spaces for three bullets.

At the sheriff's station, Thaddeus's father, Fred Taylor, viewed still photographs from the Shell station surveillance videotape and also the surveillance video. He identified Johnson as the person depicted in the surveillance photos.

Thaddeus told detectives the person depicted in the still photos resembled Johnson, and Johnson had a hat and sweatshirt like the person in the video wore. Thaddeus began to cry when he saw the surveillance video. He told the detectives the person in the video looked like Johnson, and he was pretty sure it was Johnson.

Thaddeus testified that Johnson first showed him a gun after Johnson returned from a trip to Los Angeles. Thaddeus saw the gun maybe one or two more times. The gun was kept in the bedroom in a speaker box connected to the computer. Thaddeus had never fired the gun.

---

[3] The detective who retrieved the handgun testified that the gun fired both .380-caliber and nine-millimeter rounds.

Immediately prior to his arrest, Johnson called his uncle Fred. Fred encouraged Johnson to turn himself in. Johnson told Fred that he had "shot someone Thursday night." Johnson then surrendered himself to authorities.

Johnson gave a statement to detectives in which he admitted shooting Chetty, shooting at Rui Mar in the uncharged Roseville robbery, and committing the other robberies, including the robbery at the Valero/Arco station against Thomas Claussen. The trial court suppressed Johnson's confession on *Miranda* grounds.

A forensic specialist determined the two .380-caliber casings and one .380-caliber bullet recovered from the uncharged Roseville robbery scene, and the .380-caliber casings and two .380-caliber bullets recovered from the Shell station murder scene, were all discharged from the Beretta nine-millimeter handgun found in Thaddeus and Johnson's bedroom.

We provide additional facts below as needed.

## JOHNSON'S APPEAL

### I

### *Suggestiveness of Identification Procedures*

Johnson claims the court erred when it refused to suppress (1) the pretrial identifications made at live lineups by Timothy Meton, Rui Mar, Mathew Johnson, and Lidia Fretwell; (2) the pretrial identification made from a photo lineup by Jesus Fernandez; and (3) the in-court identifications made by these same witnesses, and, in particular, Mathew Johnson. Johnson asserts the procedures used to obtain the pretrial identifications were unduly suggestive, and that the procedures wrongfully tainted the in-court identifications. We disagree.

A. *Live lineups*

1. *Background information*

Meton, Mar, Mathew, and Fretwell identified Johnson at live lineups. In each lineup, the suspects were presented to the witnesses simultaneously rather than sequentially. Citing to psychological journals, Johnson claims group lineups produce less reliable identifications and thus identifications at such lineups should be suppressed.

Johnson also faults the live lineups because he was thinner than the other suspects and because he was the only suspect who had a braid protruding from one side of his hat.

Johnson also claims that police suggestively tainted the lineup identifications by Meton and Mar by showing the witnesses photos before the live lineups. Police showed Meton a sequential photo lineup that included Johnson's photo, but Meton was unable to identify a suspect. Five days later, Meton viewed the live lineup. Johnson was the only person in the lineup whose photo had been included in the photo lineup. Meton identified Johnson as the suspect, but only after he asked the suspects to say "hurry up" and "underneath, too," two phrases the robber had used at the time of the robbery.

As for Mar, she was asked by a Roseville police sergeant to view still photos taken from the surveillance video of the Chetty murder posted on the Sacramento County Sheriff's Department Web site because the facts surrounding the two incidents were similar. Mar viewed the photos, recognized the suspect in them as the suspect who attempted to rob her, and reported her identification to the Roseville Police Department.

One week later, Mar attended a live lineup in Sacramento County, and she quickly identified Johnson as the person who had robbed her. Johnson claims the use of photos prior to the live lineups improperly tainted Meton's and Mar's pretrial identification of him.

### 2. *Analysis*

We review de novo a trial court's ruling that a pretrial identification procedure was not unduly suggestive. (*People v. Kennedy* (2005) 36 Cal.4th 595, 609 [31 Cal.Rptr.3d 160, 115 P.3d 472].)

■ "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

■ "[D]efendant has the burden of showing that the identification procedure was unduly suggestive and unfair 'as a demonstrable reality, not just

speculation.' [Citation.] A due process violation occurs only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' [Citation.]

"We have held that an identification procedure is considered suggestive if it 'caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (*People v. Cook* (2007) 40 Cal.4th 1334, 1355 [58 Cal.Rptr.3d 340, 157 P.3d 950].)

If the defendant fails to show that the identification procedures were unduly suggestive, we need not address any arguments regarding the identifications' reliability under the totality of the circumstances. (*People v. Cook, supra*, 40 Cal.4th at p. 1355; *People v. Cunningham, supra*, 25 Cal.4th at p. 989.)

Johnson has not shown that the live lineup procedures used here were unduly suggestive. First, he provides no legal authority to support his claim that group lineups are inherently impermissibly suggestive, and we are aware of none. Group lineups have long been an accepted identification procedure, and nothing in this case indicates we should question that format.

Second, the lineup itself was not unduly suggestive. Nothing in the lineup caused Johnson to "stand out" from the others in a way that would suggest the witness should select him. The lineup consisted of five Black men. Each appears to be of similar age, complexion, and body type. Each wore a blue cap and a gray sweatshirt over orange jail clothing and a T-shirt. At least two of the five, defendant and one other, had braids or dreadlocks in their hair, while two others appear to have similar type of hair. Viewed with the other suspects, defendant does not stand out in a way that would indicate to the witnesses they should have selected him.

Third, the use of photographs before Meton's and Mar's lineups was not impermissibly suggestive. California and federal courts have rejected Johnson's argument, made against Meton's identification, that identification procedures are impermissibly suggestive if the defendant is the only person appearing in both a display of photographs and a subsequent lineup. "[T]he fact that defendant alone appeared in both a photo lineup and a subsequent live lineup does not per se violate due process." (*People v. Cook, supra*, 40 Cal.4th at p. 1355; see also *People v. Wimberly* (1992) 5 Cal.App.4th 773, 789 [7 Cal.Rptr.2d 152]; *U.S. v. Davenport* (9th Cir. 1985) 753 F.2d 1460, 1463.)

Regarding Mar's identification, Johnson has not submitted copies of the photos Mar viewed on the sheriff's Web site. Thus, we cannot determine what prejudicial effect, if any, those photos could have had on Mar's subsequent

identification of Johnson in the live lineup. Although the photos were made from the surveillance video, we do not know what exactly they depicted. We certainly cannot say the procedure was unnecessary. A police sergeant from a different jurisdiction asked Mar to view the photos based on the similarity in the crimes and in order to solve the crime against Mar. Under these circumstances, Johnson fails to demonstrate Mar's identification of him occurred under unduly suggestive procedures.

B. *Fernandez photo lineup identification*

Johnson faults the procedure the sheriffs used in obtaining Jesus Fernandez's pretrial identification. Prior to showing Fernandez a photo lineup, a detective showed him the surveillance video from his own robbery. After viewing the video and the photo lineup, Fernandez first identified two persons who could have been the robber, and then he identified Johnson as the robber.

Johnson acknowledges this type of procedure was approved in *People v. Ingle* (1986) 178 Cal.App.3d 505, 512–514 [223 Cal.Rptr. 723], but he nonetheless claims the procedure here tainted Fernandez's identification of him. It did not. "[U]nlike the recollections and descriptions of a human witness, the recorded memory of the video surveillance camera has little serious potential to mislead. Indeed, its opposite potential to correct and enhance the reliability of an eyewitness identification in cases like the present would appear greater than its potential to cause an incorrect result. Accordingly, we find nothing inherent in the procedure with which we deal in this case that can be said to be unnecessarily suggestive and conducive to irreparable mistaken identification." (*Id.* at p. 513.)

C. *In-court identifications, especially by Mathew Johnson*

Johnson argues the in-court identifications by the witnesses should have been suppressed due to their pretrial identification procedures. Having determined the pretrial procedures were not unduly suggestive, we agree the trial court correctly refused to suppress the witnesses' in-court identifications.

Johnson particularly attacks Mathew Johnson's in-court identification. Mathew, who previously identified Johnson at a live lineup, did not bring his glasses to court, so he was allowed to leave the witness stand and approach counsel table to make an identification of Johnson.

Later, defense counsel moved for a mistrial, claiming Mathew's identification was a suggestive identification procedure. The trial court disagreed with the argument and denied the motion. It explained: "I did this in the context of a very clear and unequivocal identification at the lineup which I found to be

fair, and given the circumstances that Mr. Johnson is the only black male seated at the counsel table, the difference between this witness sitting at the witness stand with glasses on and looking at the counsel table to identify the black man there as being the robber or not being the robber is not distinguishable from being walked up to the counsel table and looking at the same person more closely."

As the trial court explained, its action in allowing Mathew to view Johnson at the counsel table did not cause Johnson to stand out any more than did the fact that defendant was the only Black man sitting at the counsel table. Someone could have given Mathew a pair of glasses, and the procedure would have been no different substantively. The court's action was not unduly suggestive.

Johnson faults the procedure because on cross-examination, Mathew stated Johnson had a tattoo on the left side of his neck. Mathew had never told anyone that fact before. Johnson claims this statement could have resulted only from the identification procedure. However, on further cross-examination, Mathew explained he recalled seeing the tattoo at the time of the robbery but he likely did not mention it to police because he was "stunned" over having been in a robbery. The matter thus went to the weight of Mathew's identification, not to its admissibility.

In sum, the identification procedures used in this case were not unduly suggestive.

## II

### Excluding Evidence of Uncharged Robbery under Evidence Code Section 352 Based on Suppressed Confession

Johnson claims the trial court erred when it relied on his suppressed confession to the uncharged robbery of Thomas Claussen at the Arco/Valero station to determine the evidence from that robbery, which Johnson claimed was exculpatory, was inadmissible under Evidence Code section 352 as misleading and likely to confuse the jury. We conclude the trial court did not err by relying on the suppressed confession in this instance.

A. *Background information*

Originally, both Johnson and Holmes were charged with the June 30, 2005 robbery of Thomas Claussen at the Arco/Valero gas station at San Juan Avenue and Winding Way. The prosecution later dropped the charge against Johnson but continued to press the charge against Holmes.

After his arrest, Johnson confessed to detectives that he committed the Claussen robbery and that he wore the Kobe Bryant jersey seen on him on the store's surveillance video. The trial court, however, suppressed all of Johnson's statement from being used in the People's case-in-chief because Johnson did not receive an adequate *Miranda* warning. The statement was admissible only to impeach defendant if he testified, as the court found the statement was not a product of coercion.

Holmes also admitted her involvement in the Claussen robbery. She informed detectives after her arrest that she drove Johnson to the Arco/Valero station. She claimed Johnson did not say anything to her afterwards. She did not know what Johnson had done there until a couple of days later when Johnson told her.

Claussen, the victim of that robbery, viewed a live lineup about two weeks after the incident. Johnson was in the lineup. Claussen was unable to identify anyone as the robber. Claussen wrote he was unable to identify anyone because "the guy who came in was darker."

During motions in limine, and after the People had dropped the Claussen robbery charge against Johnson, Johnson's attorney asked the court to allow Johnson's jury to hear evidence of this uncharged robbery that would otherwise have been presented only to Holmes's jury. Defense counsel claimed the evidence was relevant and exculpatory because Claussen had stated the culprit was darker skinned than those in the lineup and thus had eliminated Johnson as a suspect.

The prosecutor urged the court not to admit the evidence pursuant to Evidence Code section 352.[4] The prosecutor argued that admitting the evidence in Johnson's case as exculpatory was a fraud on the court because Johnson had confessed in his suppressed statement that he committed this robbery.

The trial court denied Johnson's motion, but it did so without prejudice if Johnson chose to develop an affirmative defense arguing that his cousin, Thaddeus Taylor, was the gunman or had performed other robberies.

Thaddeus testified at trial. He acknowledged his complexion is darker than Johnson's. Both he and Johnson wore their hair in braids at times. Johnson wore an earring in his left ear, and Natalie and Chelsea testified that

---

[4] Evidence Code section 352 authorizes a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Thaddeus wore an earring. (Thaddeus denied he wore an earring.) Both Johnson and Thaddeus had their tongues pierced. When Natalie first met Johnson, she sometimes confused him with Thaddeus because they looked similar. A friend of Natalie's who had been dating Thaddeus also confused Johnson and Thaddeus.

One difference between Johnson and Thaddeus was that Johnson has a tattoo on the left side of his neck with the words, "Smile now cry later." Thaddeus did not have a tattoo.

Of relevance to Johnson's case, Thaddeus stated he and Johnson shared a room at his father's house in 2005. Thaddeus's father, Fred Taylor, required Thaddeus and Johnson to have jobs and pay rent in order to stay at the house. Thaddeus and Johnson had worked at the same drug store for a time, but both had quit and neither was working at the time of the crimes. They shared each other's clothes, and Thaddeus owned a Kobe Bryant jersey like the one the Claussen robber wore. Defendant Holmes was one of Thaddeus's friends, and she had given him rides a couple of times in her car. Thaddeus knew where Johnson kept his gun. A few days after Chetty's murder, Thaddeus showed detectives where Johnson's gun was hidden inside a speaker box in his bedroom. Thaddeus denied committing any of the robberies or the murder.

Before Thaddeus completed his testimony, Johnson filed a motion asking the court to reconsider its ruling that excluded evidence of the uncharged Claussen robbery in his trial. Johnson asserted Claussen's failure to identify him, and, in light of Thaddeus's darker complexion, Claussen's statement that the robber was darker than him, were relevant facts in opposition to the prosecution's showing of a pattern in all of the robberies. He also noted a darker Black male was seen purchasing bullets at the Big 5 store with Johnson, Holmes, and Schroeder. Johnson argued his prior confession to the Claussen robbery was irrelevant and could not be considered because the court had suppressed his statement.

At a hearing on the motion, Johnson specifically raised the defense of third party culpability as another basis for admitting the evidence. The perpetrator of the Claussen robbery was wearing a Kobe Bryant jersey, Thaddeus owned such a jersey, and a detective had allegedly commented to Thaddeus during an interview that he looked like the person depicted in a surveillance photo from the Claussen robbery.

The trial court denied the motion to modify its prior order. The court researched the issue of whether it could rely on the suppressed confession in this instance and found no precedent. From that point, the court reasoned as follows:

"So that leaves me with a situation that there is an uncharged robbery and that the only reason not to allow Mr. Johnson to present it to this jury is that the Court is possessed of this knowledge: That out of a suppressed statement, a confession, the defendant admitted doing that robbery and wearing that shirt, and the jury does not know that; and out of an admissible statement, but not in Mr. Johnson's trial, the co-defendant Ms. Holmes has said that the defendant did that robbery.

"One approach, obviously, would be for the Court to just step back and say that evidence is suppressed and it cannot be considered; there is no issue before me. Once I found that there's third-party culpability evidence that was otherwise relevant, it goes before the jury; or that a third-party culpability defense is valid and that if there's third-party culpability evidence otherwise relevant, it goes before the jury.

"But to do that, I would have to be complicitous in putting that misleading information before the jury, which I think would be contrary, among other things, to [section] 352 of the Evidence Code, although, plainly, I have the discretion to that.

"But more fundamentally, contrary to the Court's responsibility to the integrity of the judicial system and of the trial itself, the integrity of the system has to stand for something, and if the Court were to consider what's before me and affirmatively conclude that the uncharged offense which the Court makes a factual finding is something that the defendant and not Mr. Taylor did based upon the defendant's own statement and the statement of Ms. Holmes, the Court would be complicitous in putting inaccurate, confusing and misleading information before the jury.

"The *Miranda* holding was designed to protect the defendant. It was not intended to give him a sword to go after the other side. If I in suppressing the *Miranda*—suppressing the confession insofar as it did violate *Miranda*, which it did, and even though the confession itself was voluntary, uncoerced and reliable, if I extend that to do more than simply prevent the People from using it in their case and allow the defendant to rely on it [(the exclusion)] to put misleading information in front of the jury, then I think I'm compromising the integrity of the trial process, and I would go a step further in compromising the integrity of the *Miranda* holding itself.

"I'm mindful that if the defendant were to take the stand, which plainly he wouldn't if the Court allowed this uncharged count in, that the People could introduce his confession to impeach him.

"There are a number of ways to address that consideration. One would be to say to the defendant well, you may put on the evidence of the uncharged

offense, but now the district attorney should be entitled by analogy to what would happen if you took the stand yourself, Mr. Johnson, and testified to apprise the jury of your contrary prior statement. There is no case law that stands for that proposition and I'm not going to do that because I think the proper thing to do would be to simply conclude that [a voluntary,] uncoerced, reliable but properly suppressed confession pursuant to *Miranda* in which the defendant admits to an uncharged count that the defendant is thereby precluded from presenting evidence that another person committed that uncharged count to advance a third-party culpability defense. Certainly the defendant can take the stand and advance the argument, but I don't think he should be permitted to put before the jury through other witnesses information which he knows to be untrue.

"*Miranda* is a defensive, not an offensive, mechanism. It's to protect the defendant, not to pull the wool over the jury. [¶] . . . [¶]

". . . [I]t seems to me that the proper course is to preclude the defendant from putting this information in front of the jury through proxy. If he wishes to testify and subject himself to his prior inconsistent statement on that, that's certainly his option."

Before us, Johnson claims the trial court's ruling is incorrect. He asserts that by excluding the third party culpability evidence based on his suppressed confession, the court wrongly set aside the constitutional presumption of innocence and made its own determination that Johnson was guilty of committing the Claussen robbery by relying on the inadmissible confession. He asserts the court was required to apply the normal standard of admissibility of third party culpability evidence, and this evidence satisfied that standard and was not unduly prejudicial under Evidence Code section 352.

## B. *Analysis*

Johnson appears to have modified his direct attack under *Miranda*. He now argues the court's reliance on the confession as the basis for not admitting the Claussen robbery evidence amounted to a violation of the presumption of innocence that attached to him at trial. In other words, Johnson claims the trial court applied the presumption of innocence differently to him, because he was a confessing defendant, than it would have applied the presumption to a nonconfessing defendant. He asserts the court determined Johnson was guilty of committing the uncharged robbery based on his confession, and it thus determined the third party culpability evidence was inadmissible because it had already found Johnson to be guilty of that crime. The court's doing so, Johnson claims, ultimately denied him his right to present a defense, particularly in light of the rule of *Miranda*.

Johnson's argument misstates the trial court's action, and it misunderstands how the presumption of innocence and the right to present a defense apply to his case. The court did not find Johnson guilty of the uncharged robbery. It concluded only that his confession was relevant, reliable, and admissible for the limited purpose of the court's weighing the prejudicial effect of admitting the Claussen robbery evidence.

The presumption of innocence does not prohibit a court from weighing the credibility and prejudicial nature of third party culpability evidence under Evidence Code section 352. The presumption is not irrebuttable, as Johnson's argument implies. Any competent evidence which tends to rebut the presumption is admissible, and the presumption is overcome by proof of guilt beyond a reasonable doubt. (*People v. Yeager* (1924) 194 Cal. 452, 486 [229 P. 40].)

Considering and weighing inculpatory evidence does not violate the presumption of innocence. "It is true, as suggested by appellant, that where two conclusions may reasonably be drawn concerning the defendant's conduct, one assigning a guilty and the other an innocent purpose thereto, it is the law that innocence will be presumed [by the jury], rather than guilt. But to give due weight to the presumption of innocence does not require that jurors [or, in this instance, the court] blind their eyes and shackle their reason in viewing the evidence and in judging the defendant's intentions." (*People v. McDougal* (1925) 74 Cal.App. 666, 672 [241 P. 598].) Certainly if a jury may weigh evidence without voiding defendant's presumption of innocence when fulfilling its factfinding responsibilities and deciding his guilt, the court may weigh evidence without violating defendant's presumption of innocence when fulfilling its factfinding responsibilities to decide whether to admit evidence under Evidence Code section 352.

Here, the court accorded great weight to Johnson's suppressed confession, and rightly so. Johnson made his confession voluntarily, and Holmes corroborated Johnson's admission in her confession. The court did not violate the presumption of innocence in making this factual determination.

In short, the presumption is not a bar to the court weighing evidence when called upon to do so. Johnson cites no case that so much as even intimates the presumption of innocence would interfere with a court's weighing of evidence when determining admissibility under Evidence Code section 352. The presumption simply does not apply in the manner Johnson asserts.

Nor does the court's weighing of evidence under Evidence Code section 352 deny Johnson a right to present a defense of third party culpability. Our Supreme Court faced this same argument in *People v. Hall*

(1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99], and rejected it. The court wrote: "Defendant contends his constitutional right to present a defense precludes any application whatever of [Evidence Code] section 352 to third-party culpability evidence: even remote evidence of motive without more, he argues, might raise a 'reasonable doubt' of guilt. Indeed, defendant insists, the concept of reasonable doubt is itself so elusive that any attempt to weigh the probative value of such evidence must fail. He asserts that no amount of time spent presenting such a defense could be regarded as 'undue,' and the only prejudice the court must avert is 'emotional bias.' [¶] The claim does not withstand scrutiny. As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.] As we observed in [People v. Mendez (1924) 193 Cal. 39 [223 P. 65]], this principle applies perforce to evidence of third-party culpability: 'if evidence of motive alone upon the part of other persons were admissible, . . . in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased . . . .' (People v. Mendez, supra, 193 Cal. at p. 52.) Trials must reach an end, and that end must be logical. (*Ibid.*)" (*People v. Hall, supra*, 41 Cal.3d at pp. 834–835, original italics.)

Even without the Claussen robbery evidence, Johnson was still able to present his third party culpability defense. The jury heard all of the testimony concerning the similarities between Johnson and Thaddeus. They looked similar, they lived together, they shared clothes, and they both were unemployed and needed money to pay rent. Thaddeus knew Holmes. He also knew where Johnson kept his gun. There was even evidence that one of the witnesses who came upon the murder scene, when shown two photo lineups, excluded Johnson as the suspect but included Thaddeus as someone who resembled the suspect. Defense counsel also argued to the jury that Thaddeus was the perpetrator. The court's ruling did not deny Johnson his right to present this defense.

Thus, the presumption of innocence and the right to present a defense did not prevent the court from weighing all of the evidence before it to determine whether the Claussen robbery evidence would be misleading and prejudicial. The only question, then, is whether Johnson's Fifth Amendment right not to incriminate himself and the *Miranda* rule prevented the court from relying on the suppressed confession when it ruled under Evidence Code section 352. We conclude it did not.

■ The *Miranda* exclusionary rule is a prophylactic and constitutional rule employed to protect against violations of the Fifth Amendment's

self-incrimination clause as applied to the states under the Fourteenth Amendment. (*United States v. Patane* (2004) 542 U.S. 630, 636 [159 L.Ed.2d 667, 674–675, 124 S.Ct. 2620] (plur. opn.) (*Patane*); *Dickerson v. United States* (2000) 530 U.S. 428, 444 [147 L.Ed.2d 405, 420, 120 S.Ct. 2326].) The rule fosters the "general goal of deterring improper police conduct" and "the Fifth Amendment goal of assuring trustworthy evidence . . . ." (*Oregon v. Elstad* (1985) 470 U.S. 298, 308 [84 L.Ed.2d 222, 231–232, 105 S.Ct. 1285] (*Elstad*).)

*Miranda*, however, has never been interpreted as barring all use of suppressed confessions at trial. "*Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to [being warned or] having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." (*Harris v. New York* (1971) 401 U.S. 222, 224 [28 L.Ed.2d 1, 4, 91 S.Ct. 643] (*Harris*).) "[T]he *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted." (*Elstad, supra*, 470 U.S. at p. 307.)

█ The United States Supreme Court has carved out exceptions to the exclusionary rule upon "recognition that the concerns underlying the *Miranda* . . . rule must be accommodated to other objectives of the criminal justice system." (*Patane, supra*, 542 U.S. at p. 644 (conc. opn. of Kennedy, J.).) In *James v. Illinois* (1990) 493 U.S. 307 [107 L.Ed.2d 676, 110 S.Ct. 648] (*James*), the high court set forth the balancing test it uses to establish exceptions to the *Miranda* exclusionary rule. Under that test, exceptions to the rule are made "where the introduction of reliable and probative evidence would significantly further the truth-seeking function of a criminal trial and the likelihood that admissibility of such evidence would encourage police misconduct is but a 'speculative possibility.' [Citation.]" (*James, supra*, 493 U.S. at pp. 311–312, fn. omitted.)

In particular, the *Miranda* exclusionary rule does not prohibit the introduction of a voluntary, uncoerced and reliable but unwarned statement made by a defendant in order to prevent the defendant from committing perjury or a fraud on the court. " 'It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' " (*Harris, supra*, 401 U.S. at p. 224, quoting *Walder v. United States* (1954) 347 U.S. 62, 65 [98 L.Ed. 503, 507, 74 S.Ct. 354].)

■ *Harris* authorized impeaching a testifying defendant with his voluntary but suppressed confession. "The Court in *Harris* rejected as an 'extravagant extension of the Constitution,' the theory that a defendant who had confessed under circumstances that made the confession inadmissible, could thereby enjoy the freedom to 'deny every fact disclosed or discovered as a "fruit" of his confession, free from confrontation with his prior statements' and that the voluntariness of his confession would be totally irrelevant. [Citation.]" (*Elstad, supra,* 470 U.S. at p. 307.)

Although *Harris* concerned the admission of a defendant's suppressed statement to impeach the defendant when he testifies at trial, the ruling's principle of admitting the evidence in a context other than the prosecution's case-in-chief so as to avoid false testimony applies equally here and satisfies the *James* balancing test. First, considering the evidence for the limited purposes of Evidence Code section 352 substantially furthers the trial court's truth-seeking function. Johnson sought to use the testimony of Claussen to convince the jury he did not rob Claussen and, by extension, commit the other robberies, when in fact he was the person who robbed Claussen. The court's reliance on his suppressed confession significantly furthered its truth-seeking function by ensuring the jury was not confused or misled by a bogus argument.

Second, the court's use of the suppressed confession in this instance raised no threat of police misconduct. A law enforcement officer has nothing to gain from this decision. It is entirely improbable a law enforcement officer would omit or incompletely give a *Miranda* warning in the hope a resulting confession may be considered in a Evidence Code section 352 motion to counter a misleading argument by a duplicitous defendant. Such a scenario is too speculative and tenuous for a law enforcement officer to entertain while conducting an interrogation.

Moreover, the court's use of Johnson's confession under Evidence Code section 352 was outside the sweep of the *Miranda* presumption and did not violate Johnson's Fifth Amendment rights, as the evidence was not used by the prosecution in its case-in-chief. The confession was not used to determine Johnson's guilt of any of the crimes with which he was charged. The jury never heard or knew of Johnson's confession. Indeed, the trial court considered only that portion of the confession where Johnson admitted committing an uncharged offense. Johnson cannot argue the confession resulted in him incriminating himself when he was not charged with the crime to which he confessed.

Johnson argues the trial court's consideration of his confession violated the rule of *Holmes v. South Carolina* (2006) 547 U.S. 319 [164 L.Ed.2d 503,

126 S.Ct. 1727], but that case does not apply here. There, the Supreme Court struck down a state rule of evidence that third party guilt was inadmissible where there was strong evidence, particularly, strong forensic evidence, of the defendant's guilt. The high court invalidated the rule in part because it preempted the trial court from considering the prejudicial effects of the third party evidence with its probative value, as well as the credibility of the prosecution's evidence, and thus was an arbitrary rule. (*Id.* at pp. 326–331.) Of course, the process missing in the state rule was the very process in which the trial court here was engaged when it considered Johnson's confession— weighing the probative value of Johnson's third party evidence with its prejudicial effect and in consideration of the prosecution's suppressed evidence. *Holmes v. South Carolina* did not involve the effect of *Miranda* on the court's consideration of a suppressed confession under Evidence Code section 352, and thus it does not aid Johnson at all.

We are aware the Supreme Court in *James, supra,* 493 U.S. 307, determined the impeachment exception to the Fourth Amendment's exclusionary rule did not extend to the prosecution's use of evidence illegally obtained from a defendant to impeach the testimony of defense witnesses besides the defendant. In that case, the high court reasoned that allowing a defendant's inculpatory statement, suppressed as fruit of an unlawful arrest, to be used to impeach other defense witnesses would not significantly promote the court's truth-seeking function as it would likely chill defendants from presenting a defense through the testimony of others. (493 U.S. at pp. 314–316.) The court also determined that admitting the suppressed statement to impeach all defense witnesses would encourage police misconduct to obtain evidence unlawfully, as such evidence could be used against potentially many more witnesses. (*Id.* at pp. 317–319.)

Although we apply the balancing test announced in *James,* we reach a different conclusion on the facts presented to us. The reasoning of *James* is inapposite here. The trial court did not authorize use of Johnson's confession to impeach a witness. Rather, the court considered the confession in order to prevent Johnson from extrapolating a false argument from truthful testimony. *James* was concerned that a broad exception to the exclusionary rule would chill defendants from calling witnesses "who would otherwise offer *probative* evidence." (*James, supra,* 493 U.S. at p. 316, italics added, fn. omitted.) *James* said nothing about a defendant's attempt to use *Miranda* as a sword to force the jury to consider a false and misleading argument.

As already stated, unlike in *James,* allowing the trial court to utilize the suppressed confession when ruling on the admissibility of evidence under Evidence Code section 352 significantly promotes the court's truth-seeking function, as it prevents false or misleading argument from being made to the jury. The only defense chilled by the trial court's action was a false defense.

Moreover, the trial court's consideration of the suppressed confession did not weaken the exclusionary rule's deterrent effect. It did not increase the number of witnesses against which the confession could be used, nor did it significantly increase the occasions on which the confession could be used.

In effect, the trial court was using Johnson's suppressed confession to impeach Johnson's implied claim that he did not perform the Claussen robbery. Such use was approved in *Harris* and recognized approvingly in *James*. (*James, supra*, 493 U.S. at pp. 312–313.) Because the focus here is solely on Johnson, the risks contemplated by the *James* court do not exist in this case.

The Supreme Court of Illinois faced a situation similar to this case in *People v. Payne* (1983) 98 Ill.2d 45 [74 Ill.Dec. 542, 456 N.E.2d 44] (*Payne*), and reached the same result we do. There, after arresting the defendants, police officers searched their apartment without a warrant. They found two handguns inside a refrigerator. The trial court suppressed the weapons. (*Id.*, 456 N.E.2d at pp. 45–46.)

On defendant's cross-examination of one of the arresting officers, however, counsel asked if the defendants and their apartment were searched. The officer said they were, and counsel asked no further questions. The trial court determined this cross-examination " 'opened the door' " to admitting one of the suppressed weapons to rebut the false impression created by the cross-examination that nothing was recovered from the apartment. (*Payne, supra*, 456 N.E.2d at p. 46.)

The Illinois Supreme Court upheld the trial court's admission of the suppressed weapon. Although *Payne* preceded *James*, the Illinois Supreme Court presciently applied the balancing test later established by *James*, and its reasoning applies equally here: "The problem in this case arose not from false statements, made by defendants while testifying, but rather from cross-examination and potential argument by the defense which falsely implied the absence of physical evidence connecting defendants with the crimes. . . . [W]e do not believe that [the defendants] could affirmatively misrepresent or falsely imply that the police found no physical evidence connected with the robbery during their search. [Citations.]

" 'There is no gainsaying that arriving at the truth is a fundamental goal of our legal system' (*United States v. Havens* (1980), 446 U.S. 620, 626 [64 L.Ed.2d 559, 565, 100 S.Ct. 1912]), and we consider that allowing the defense or prosecution to misrepresent to the jury the actual facts of the case is neither consistent with the proper functioning and continued integrity of the judicial system nor with the policies of the exclusionary rules." (*Payne, supra*, 456 N.E.2d at pp. 46–47.)

In this instance, the truth-seeking function of the court outweighs any threat of police misconduct or of a violation of Johnson's right not to incriminate himself. As a result, the trial court did not abuse its discretion under Evidence Code section 352 when it refused to admit evidence of the Claussen robbery based on Johnson's suppressed confession to that robbery. The court's action did not violate Johnson's rights to a presumption of innocence, to present a defense, and to the protections of *Miranda*.

III

*Exclusion of Exculpatory Statement Under Evidence Code Section 356*

Johnson faults the trial court for not admitting into evidence pursuant to Evidence Code section 356 an exculpatory statement he allegedly made to one of his girlfriends, Natalie Brand. He particularly faults the court because it admitted into evidence inculpatory statements he made to Natalie but would not admit his exculpatory statement. We conclude the inculpatory statement was not admissible under Evidence Code section 356, and thus the trial court did not err.

A. *Background information*

When Natalie was interviewed by detectives for the first time, she told them Johnson had told her the day after the murder, and before being arrested, that he went to rob the clerk but he did not mean to shoot and kill him. Natalie made similar statements to detectives in a second interview. Natalie also told the detectives during the second interview that Johnson admitted to her that he had killed the clerk. He had gone to do the robbery because his uncle had kicked him out of the house.

During motions in limine, defense counsel sought to introduce pursuant to Evidence Code section 356 a statement of Johnson's that Natalie relayed to detectives when she was interviewed a third time, some two months after her second interview. Allegedly at some point after being arrested, Johnson had told Natalie that he did not do it and that " 'he was just protecting somebody.' "

The trial court denied the motion. It ruled Johnson's statement was not admissible under Evidence Code section 356 because the statement "does not come within 356 as filling out the context of it, but it still stands alone as a self-serving out-of-court statement."

Prior to Natalie testifying, defense counsel reasserted that Johnson's exculpatory statement to Natalie should be admitted pursuant to Evidence Code

section 356. He claimed the interest of justice required the statement to be admitted so the jury was not left with the impression that Johnson never denied committing the murder. He also claimed it was unfair not to admit the statement under Evidence Code section 356 because Natalie would then be limited to discussing only Johnson's inculpatory statements but not the exculpatory statement.

The prosecutor argued the exculpatory statement should be excluded because it was hearsay with no exception. He also claimed the statement was not admissible under Evidence Code section 356 because the statement, made after Johnson's arrest, had no connection to explain or complete his earlier statements made to Natalie prior to his arrest.

The trial court again denied Johnson's request to introduce his exculpatory statement due to the lack of a hearsay exception admitting the evidence. It also denied the request on the basis that even if the statement was not hearsay, it would not be admissible under Evidence Code section 356 because the exculpatory statement was not made in the same conversation as the inculpatory statements and because Evidence Code section 356 did not admit hearsay evidence.

The court stated: "On the evidentiary issue, I am not going to permit the elicitation from Natalie Brand of self-serving hearsay statements from the defendant to her. There are proper ways to get that evidence before the jury if that is the defendant's desire. It simply is a situation where the defendant can in every case—speaking now in the generic sense—say to his girlfriend or mother or anybody else who would serve his purposes that he didn't do the thing and therefore . . . boot strap his self-serving statement into evidence.

"There is a reason why hearsay evidence is excluded absent some specific exception and, you know, those reasons that several are valid and need to be respected.

"I do think that there is some substance to the defendant's [Evidence Code section] 356 argument. If it were in the context of a specific immediate conversation in which the defendant both inculpates and exculpates himself that your [section] 356 argument that the exculpating statement ought to be admitted has more merit, has more traction. I still feel it's precluded under the hearsay rules, but I think it's a different situation than a situation where there is a separate, discrete communication from Natalie Brand to the defendant or from Natalie Brand to the detectives where she simply references the defendant's self-serving hearsay. That's not required. [Section] 356 simply does not stand for the proposition that the self-serving hearsay comes in."

B. *Analysis*

Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

██ "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 156 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

A court does not abuse its discretion when under Evidence Code section 356 it refuses to admit statements from a conversation or interrogation to explain statements made in a previous distinct and separate conversation. (See *People v. Williams* (2006) 40 Cal.4th 287, 319 [52 Cal.Rptr.3d 268, 148 P.3d 47] [within court's discretion not to admit statements made by defendant in first interview with detectives to explain statements made in another interview 24 hours later]; *People v. Barrick* (1982) 33 Cal.3d 115, 131–132 [187 Cal.Rptr. 716, 654 P.2d 1243] [within court's discretion not to admit postarrest statements to explain prearrest statements; defendant's arrest and admonishment of constitutional rights separated the interrogation into two separate interrogations].)

The trial court did not abuse its discretion here in refusing to admit Johnson's exculpatory statement under Evidence Code section 356. The court reasonably determined that Johnson's admissions and his exculpatory statements to Natalie were made at different times. Natalie first told detectives about Johnson's inculpatory statements shortly after his arrest, and she stated he made them prior to his arrest. About two months later, Natalie told detectives of Johnson's exculpatory statement. There is no evidence defendant's inculpatory and exculpatory statements were part of the same conversation. Thus, the later, postarrest exculpatory statement did not qualify for admission under Evidence Code section 356.

The statement also did not qualify for admission under Evidence Code section 356 because Johnson's exculpatory statement was not necessary to make his prior admissions understood. His earlier admissions to Natalie and others were unambiguous.

Johnson claims not admitting the exculpatory statement under Evidence Code section 356 because it did not satisfy a hearsay exception was an invalid ground for rejecting the evidence. Assuming for purposes of argument it was, we nonetheless uphold the decision on the correct basis just discussed. " ' " 'It is judicial action and not judicial reasoning which is the subject of review . . . .' " ' " (*People v. Parrish* (2007) 152 Cal.App.4th 263, 271, fn. 4 [60 Cal.Rptr.3d 868] (*Parrish*).)

Johnson also claims the court's action created an inaccurate picture of Johnson's statements by including only the inculpatory statements and excluding the exculpatory statement. (See *Parrish, supra,* 152 Cal.App.4th at pp. 272–273.) But the *Parrish* court made it clear, in allowing both exculpatory and inculpatory statements by a codefendant in that case to be admitted, that its ruling under Evidence Code section 356 arose because the admitted statements were made in the same interview. (152 Cal.App.4th at pp. 269, 270, 276.) There is no evidence here that Johnson made his exculpatory statement to Natalie during the same conversation they had prior to his arrest.

The trial court thus did not abuse its discretion in denying Johnson's request under Evidence Code section 356.

## IV

### *Cumulative Error*

Johnson claims the court's errors discussed above in parts II and III were cumulative constitutional errors. Because we have concluded they were not error, they a fortiori do not constitute cumulative error.

## V

### *Custody Credit*

Citing Penal Code section 2933.2, subdivision (b), the trial court stated Johnson was not entitled to any custody days of credit because he had been convicted of murder.[5] The court erred.

---

[5] Subsequent undesignated references to sections are to the Penal Code.

Section 2933.2 provides that convicted murderers are not entitled to credits pursuant to sections 2933 and 4019, but those provisions concern work time credits and conduct credits. They do not address presentence custody credits. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 646 [14 Cal.Rptr.3d 550].)

Section 2900.5 awards defendant credit for all days spent in custody. This provision applies to all defendants. (*People v. Taylor, supra*, 119 Cal.App.4th at p. 647.) Johnson was arrested on July 10, 2005, and was sentenced on January 19, 2007. He thus was entitled to 599 days of actual custody credit. We order the judgment to be modified to correct this error.[6]

HOLMES'S APPEAL

I

*Denial of Motion to Suppress Under* Miranda

Defendant Holmes claims the trial court erred when it denied her motion to suppress her confessions under *Miranda*. She claims (1) the *Miranda* warning given her was inadequate because the officers did not inform her that her statements "will" be used against her in court; and (2) she did not voluntarily, knowingly, and intelligently waive her constitutional rights. We disagree with both claims.

A. *Background information*

Holmes was interviewed by two sets of Sacramento County Sheriff's detectives on July 11, 2005. The first set, Detectives Robin Kolb and Daniel Cabral, began their interview around 5:45 p.m. They obtained preliminary information and thanked Holmes for coming to the station to talk with them. They provided the *Miranda* warning as follows:

"DET. KOLB: Um, anyway, we want to ask you some questions.

"J. HOLMES: Uh-huh.

"DET. KOLB: You probably have some questions that you want to ask us. And so we want you to just feel free to speak freely. You know, don't be afraid to ask any questions.

---

[6] The recent amendments to section 4019 do not operate to modify defendant's entitlement to credit, as he was committed for a serious felony. (§ 4019, subds. (b)(2) & (c)(2); Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 28, § 50.)

"J. HOLMES: Okay.

"DET. KOLB: There aren't any stupid questions, you know that.

"J. HOLMES: Uh-huh.

"DET. KOLB: Um, but before we get into that we have to—to clear the technicality. We have to (Unintelligible) you constitutional rights.

"J. HOLMES: Uh-huh.

"DET. KOLB: Which we refer to that as (Unintelligible) rights?

"J. HOLMES: Yeah.

"DET. CABRAL: Okay. What I'm going to be doing—I'm going to read—I'm going to read those off and then based off of this we can talk, okay?

"J. HOLMES: Uh-huh.

"DET. CABRAL: Um, you have the right to remain silent, anything you say can be used against you in a court of law. You have the right to talk to an attorney and have an attorney present before and during questioning. If you cannot afford an attorney one will be appointed free of charge to—to represent you before and during questioning if you desire. Do you understand each of these rights I've explained to you?

"J. HOLMES: Yes, I do.

"DET. CABRAL: Okay.

"DET. KOLB: (Unintelligible)?

"DET. CABRAL: (Unintelligible).

"DET. KOLB: You probably can say it better than he just said, huh?

"DET. CABRAL: A lot of people know it by heart. So you know a lot of people know them by heart. Um, having those rights in mind and, we—you know, of course we want to talk to you about everything that's—that's come up in this case—

"J. HOLMES: Uh-huh.

"DET. CABRAL: —that we've been working on. So, um, let's just start off, you—what do you know of Joseph—Joseph's involvement in things that he's been doing?

"J. HOLMES: Um, I just found out today through Thaddeus that he was the one that was in the newspaper. That I saw in the newspaper a couple of days ago that some guy got shot off of Greenback and Auburn."

The detectives continued to ask Holmes about her involvement in the gas station robberies. Holmes answered the questions freely, and she eventually admitted her involvement in the Shell station murder and three or four additional robberies. She stated she did not know Johnson had killed anyone until the detectives informed her in this interview. She also claimed she did not know Johnson had robbed anyone until after the robberies occurred. Her interview with Detectives Kolb and Cabral lasted about 50 minutes, ending around 6:35 p.m.

About two hours later, Detectives Paul Biondi and Ken Clark entered the room and began asking Holmes additional questions about her involvement in the gas station robberies. Detective Biondi challenged Holmes's assertion that she did not know Johnson was going to rob a gas station even though he asked her to park in strange spots before he went inside. Holmes, however, consistently denied knowing of Johnson's intent beforehand. This interview lasted about 30 minutes.

After the detectives left, Holmes and Schroeder, who was in the adjoining interview room, talked to each other through the wall. A detective returned and informed Holmes she was being charged with murder and attempted robbery. Holmes and Schroeder continued talking to each other through the wall until some minutes later when Holmes was removed from the room.

Prior to trial, Holmes filed a motion to suppress her statements to detectives, claiming she did not knowingly and voluntarily waive her *Miranda* rights. At the hearing, defense counsel stated Holmes was not challenging the adequacy of the warning: "[W]e're not contending that the *Miranda* advisements weren't given or weren't given properly. I think once you look at the transcript, once you watch the video, I think it's clear that they did read the *Miranda* advisements directly from the card and I think they are adequate."

Instead, counsel argued that Holmes, based on the totality of the circumstances, had not waived her rights. Counsel claimed there had been no express waiver, the detectives' tone became argumentative and accusatory, the detectives made false statements about what other witnesses had said, Holmes was under the influence of methamphetamine at the time of the

interviews, and she and Schroeder could hear each other during the interviews.[7] Holmes claimed these factors, when considered together, showed that she had not waived her *Miranda* rights.

The trial court denied Holmes's motion to suppress. After reviewing the parties' papers, reading the transcript of the interviews, and viewing the videotape of the interviews, the court concluded that Holmes's interrogation "was noncoercive and it was compliant in every respect with the terms and provisions of *Miranda*."

## B. *Analysis*

Holmes claims the trial court erred in denying her motion to suppress because (1) the warning given her was inadequate as the detectives informed her only that her statements "can" be used in a court of law, not that they "will" be so used; (2) she did not expressly waive her rights; and (3) she did not impliedly waive her rights under the totality of the circumstances. We will address each point.

We can dispose of the first two arguments quickly. First, Holmes has forfeited her argument that the warning was inadequate because she failed to raise this argument in the trial court. Indeed, she informed the court that the warning given her was in fact adequate. She cannot now claim it was inadequate.

Even were we to address the claim, we would reject it. There was no constitutional error when the deputies informed her that her statements could be used in court but did not also state they "will" be used in a court.

■ "[T]he prophylactic *Miranda* warnings are ' ". . . measures to insure that the right against compulsory self-incrimination [is] protected" ' [citation], and the warnings therefore need not be given in the exact form described in that decision [citation]. Thus, a reviewing court need not examine a *Miranda* warning for accuracy as if construing a legal document, but rather simply must determine whether the warnings reasonably would convey to a suspect his or her rights as required by *Miranda*. [Citations.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 830 [64 Cal.Rptr.2d 400, 938 P.2d 2].) The warning given Holmes satisfied this standard.

Second, we agree with Holmes she made no express waiver of her rights. It appears the detectives did not afford Holmes an opportunity to waive her

---

[7] Defense counsel claimed Holmes testified positive for methamphetamine either during or shortly after the interrogation. There was no evidence introduced showing Holmes was under the influence of drugs at the time of the interview.

rights expressly. However, this point merely begs resolution of defendant's third argument; whether she impliedly waived her rights.

 "*Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]" (*Moran v. Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 421, 106 S.Ct. 1135].)

"It is further settled . . . that a suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. [Citation.] We have recognized that a valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or a refusal to talk bars further questioning. [Citation.]

 "Although there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 667–668 [80 Cal.Rptr.3d 126, 187 P.3d 970].)

The totality of the circumstances approach "permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the [defendant's] age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." (*Fare v. Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 212, 99 S.Ct. 2560].)

Our review of the record and the totality of the circumstances surrounding Holmes's statement leads us to conclude she impliedly waived her *Miranda*

rights when she spoke with the detectives. During her interrogation, she stated she understood her *Miranda* rights. There was no indication she did not understand her rights. She was 18 years old, a high school graduate, and was able to understand and respond to all of the questions posed to her. There also was no evidence that Holmes was under the influence of drugs or alcohol at the time of the interviews.

Holmes knew she was free not to speak and could obtain an attorney, and she knew if she spoke with the detectives her remarks could be used against her in court. Yet she spoke with the deputies freely and did not refuse to answer their questions. She did not request an attorney or ask that the questioning stop. These circumstances demonstrate Holmes impliedly waived her *Miranda* rights by her continuing participation in the interrogations.

Holmes argues any implied waiver was invalid because the interviewing detectives minimized the significance of her rights, used deceptive tactics and false statements to get her to talk, and became aggressive and sarcastic to force her to talk.

Specifically, Holmes asserts Detectives Kolb and Cabral unduly minimized the significance of her rights by referring to them as "clear[ing] a technicality," describing the interview as a chance for Holmes to get answers, encouraging her to talk freely and to ask any questions, not telling her the statements "will" be used in court, and by not asking her if she wished to waive her rights.

 "We agree with the proposition that evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision—by 'playing down,' for example, or minimizing their legal significance—may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1237 [74 Cal.Rptr.2d 212, 954 P.2d 475].) However, this is not that case.

The detectives did not misrepresent the significance of Holmes's rights. Referring to the process as clearing a "technicality" and encouraging Holmes to talk and ask questions did not minimize the significance of her rights or the risks of her speaking with detectives. Holmes understood her rights and answered all of the detectives' questions with knowledge of her rights. She knew she was there to discuss a police case against Johnson, and an interrogation by a total of four detectives certainly conveyed the seriousness of the situation.

Holmes reasonably should have known the detectives were interested in her involvement in the crimes. The detectives asked her about her car before

advising her of her *Miranda* rights. Holmes told detectives she had spoken with Thaddeus, and she knew the detectives were speaking with "everybody." She thus understood the severity of the situation and the seriousness of the *Miranda* rights the detectives provided her.

Holmes claims detectives used deceptive tactics and false statements to get her to confess. She faults Detective Cabral for falsely telling her that her car was captured on surveillance video from cameras located behind the Jack in the Box next to the Shell station where the murder occurred. After hearing this, Holmes admitted she had parked her car next to the Jack in the Box and that Joseph went into the Shell station.

Holmes also faults Detective Cabral for telling her, after contradicting one of her statements with one made by Johnson, that "this is where—where we need to be honest," and later encouraging her to "tell us your side of the story so we know."

"[T]he fact that the police made misrepresentations does not necessarily render an otherwise voluntary confession inadmissible." (*People v. Engert* (1987) 193 Cal.App.3d 1518, 1524 [239 Cal.Rptr. 169]; see also *Frazier v. Cupp* (1969) 394 U.S. 731, 735–737, 739 [22 L.Ed.2d 684, 691–692, 693, 89 S.Ct. 1420].) Additionally, exhortation by a police officer to " ' "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.' " (*People v. Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].)

Again, we look to the totality of the circumstances, and we find that the alleged misrepresentation by detectives and their encouragement to Holmes to tell the truth do not establish that her confession was involuntary.

Holmes also claims Detective Biondi became aggressive and sarcastic with her. Detective Biondi challenged Holmes's assertion that she did not know Johnson had robbed the gas stations until after the robberies occurred, at times calling it "ridiculous" and that she could not "possibly not know." Holmes, however, continued to assert such was the case and did not back down. She cannot now argue that Detective Biondi's statements to her somehow rendered her confession involuntary when she did not change her story.

Reviewing the totality of the circumstances, we conclude Holmes impliedly waived her *Miranda* rights when she was interrogated by detectives. Admitting her statements into evidence was not error.

## II

### *Cruel and/or Unusual Punishment*

Holmes claims her sentence of life without the possibility of parole on her conviction of murder with special circumstances violates federal and state constitutional prohibitions of cruel and unusual punishment. She asserts the punishment is disproportionate to her crime, and she asks us to reduce her sentence on the murder count to 25 years to life with the possibility of parole.

■ "A defendant has a considerable burden to overcome when he challenges a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California and the court should not lightly encroach on matters which are uniquely in the domain of the Legislature." (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 529 [212 Cal.Rptr. 605].) We conclude Holmes is unable to meet this burden and her sentence withstands constitutional scrutiny.

■ The Eighth Amendment to the federal Constitution contains a "narrow proportionality principle" that applies to noncapital sentences by which a court determines whether a sentence constitutes cruel and unusual punishment. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 996–997 [115 L.Ed.2d 836, 866, 111 S.Ct. 2680] (conc. opn. of Kennedy, J.).) " 'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' [Citation.]" (*Ewing v. California* (2003) 538 U.S. 11, 23 [155 L.Ed.2d 108, 119, 123 S.Ct. 1179].) To apply this principle, courts compare the gravity of the offense with the magnitude of the penalty. (*Id.* at p. 28.) The gravity of the offense also takes account of the defendant's recidivism and the Legislature's choice of sanctions. (*Id.* at p. 29.)

The California Constitution's prohibition of cruel or unusual punishment similarly prohibits imposing a criminal sentence which is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], fn. omitted; see also *People v. Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*); Cal. Const., art. I, § 17.)

■ We, like the trial court when it determined the sentence and when it later refused to modify the sentence, use a three-pronged approach to determine whether a particular sentence is grossly disproportionate. First, we review "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*In re Lynch, supra,* 8 Cal.3d at

p. 425.) Second, we compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction. (*Id.* at p. 426.) Third, and finally, we compare the challenged punishment to punishments for the same offense in other jurisdictions. (*Id.* at p. 427.) The importance of each of these prongs depends upon the facts of each specific case. (*In re DeBeque* (1989) 212 Cal.App.3d 241, 249 [260 Cal.Rptr. 441].) Indeed, we may base our decision on the first prong alone. (*Dillon, supra,* 34 Cal.3d at pp. 479, 482–488.)

Holmes directs all of her argument to the first prong, that of comparing the nature of her offense, her background, and the degree of danger she presents to society. Acknowledging her sentence was mandated by state statute, she nonetheless claims the sentence is unconstitutional in light of her age, family instability, emotional and psychological disabilities, drug addiction, absence of a violent criminal background, recent history of abuse by a former boyfriend and by Schroeder, and her allegedly receiving threats from Schroeder to assist in his crimes.

We turn first to the nature of Holmes's offense. We are to consider not only the offense in the abstract, but also the facts of the crime in question, including motive, the manner in which the crime was committed, the extent of the defendant's involvement, and the consequences of her acts. (*Dillon, supra,* 34 Cal.3d at p. 479.)

In the abstract, "robbery-murder presents a very high level" of danger to society, "second only to deliberate and premeditated murder with malice aforethought." (*Dillon, supra,* 34 Cal.3d at p. 479.) The Legislature acknowledges this fact, having determined that conviction of the crime subjects the defendant to the most severe punishments authorized by law.

Regarding the facts of this offense, the jury determined Holmes had acted with the intent to kill or was a "major participant" and "acted with reckless indifference to human life" when she aided and abetted Johnson in the robbery in which Chetty was killed. The facts amply support this determination.

Holmes acted as the getaway driver for Johnson in at least four robberies over 10 days. The murder occurred during the fourth robbery. Her shared motive was money. Even though she told detectives she did not know Johnson was going to rob a store before he did it, she also said she knew they were going to perform a robbery three times, and "[w]hen I knew about it, I was taking money for it."

The facts belie her claim of ignorance. After each of Johnson's robberies, he told her what he had done. This occurred several times. Holmes cannot claim that somehow after the first robbery she did not know their shared mission was robbery.

Holmes's participation in the murder was significant. In an earlier robbery, she knew Johnson had fired shots at a store clerk when the clerk refused to give Johnson any money. Yet approximately one hour after that shooting, Holmes contacted her sister's ex-boyfriend to help Johnson purchase bullets for his gun. She drove Johnson to the Big 5 store where the bullets were purchased. Two days later she drove Johnson to the Shell station where Johnson shot and killed Chetty. She then drove Johnson away from the scene. As a result of her acts, Johnson was able to restock his ammunition supply and get to the scene of his next robbery, attempt that robbery, coldly slay Chetty, and flee successfully. Certainly the sentence imposed on Holmes was not disproportionate to the nature of her offenses or her roles in them, including the murder of Chetty.

 We next review Holmes and the degree of danger she presents to society. "This branch of the inquiry . . . focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon, supra,* 34 Cal.3d at p. 479.) "[A] punishment which is not disproportionate in the abstract is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Id.* at p. 480.)

Holmes presented some mitigating evidence to the trial court as it considered sentencing. She was 18 years old at the time of the offense. Her criminal record was small, consisting of one prior juvenile adjudication in November 2002 for burglary and petty theft, resulting in her receiving six months probation.

Holmes's mother, grandmother, and grandfather had raised Holmes, and they described her as kind, considerate, and responsible. She earned good grades and completed high school, and she intended to go to college or trade school. She had worked from the time she was 15 and a half until she was 18.

Holmes's grandmother, Rita Lawson, also told the court that Holmes had been physically abused by a former boyfriend. Schroeder had promised to protect Holmes from that boyfriend, but instead he got her involved in these crimes. Lawson stated that as a result, Holmes's "car was threatened and her family was threatened by these people."

Holmes also submitted a report prepared by Linda S. Barnard, Ph.D., at her attorney's request. Barnard evaluated Holmes and concluded Holmes was a

battered woman (or, using the new language of Evid. Code, § 1107, subd. (e), suffered from "[i]ntimate [p]artner [b]attering and [i]ts [e]ffects") due to the physical, sexual, verbal, and psychological abuse inflicted upon her by a former boyfriend and by Schroeder.

Barnard also described Holmes's drug use, noting Holmes had used drugs almost daily since she was 17 years old. She had fallen in with a bad crowd at Taco Bell where she worked, and wound up using methamphetamine every day. Barnard opined Holmes's abuse of drugs was related to her desire to have friends and fit in with a group, experiences she had not often felt in her life.[8],[9]

██ The trial court considered this mitigating evidence, but it concluded the life without parole sentence was not disproportionate. The trial court was correct. In light of the nature and scope of Holmes's culpability, her sentence does not shock the conscience or offend fundamental notions of human dignity. Nor is it grossly disproportionate to the crime. None of the mitigating facts overcomes Holmes's intentional and voluntary participation with Johnson in facilitating his robberies, restocking his ammunition supply, and receiving stolen money from him. With full knowledge of Johnson's pattern for robbing gas stations and, in one robbery prior to the murder, his firing of a gun to attempt to get money, she nonetheless remained loyal and helpful to Johnson when he restocked his ammunition supply and when he asked her to stop and wait at the Shell station and park in a lot next door. Her undeviating, knowing, and willing complicity in the crime spree, including the final robbery attempt and murder, far outweighs any personal mitigating factors.

In *Tison v. Arizona* (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 144–145, 107 S.Ct. 1676], the United States Supreme Court held that the Eighth Amendment does not prohibit a *death* sentence on a major participant in a felony that results in a murder where the defendant was not the person who killed but whose mental state was one of reckless indifference to human life. Here, Holmes was not sentenced to death, but to the lesser sentence of life in prison without the possibility of parole. Under these circumstances, her sentence was not constitutionally disproportionate.

---

[8] Bernard's report and the various family statements were never presented to the jury. Holmes admits the evidence likely was not presented to the jury because defense counsel did not want to open the door for the prosecution to argue Holmes committed the crimes to finance her drug use.

[9] Holmes says she was offered a plea bargain of second degree murder and three robbery counts with a total aggregate sentence of 16 years to life. She and her family rejected the plea.

## III

### *Custody Credit*

As with Johnson, the trial court erroneously believed section 2933.2, subdivision (b) precluded it from awarding Holmes any custody days of credit because she had been convicted of murder. Likewise, Holmes's probation report erroneously states that section 2933.2, subdivision (c) mandates no time credits for murder convictions. The court erred for the same reasons we expressed above.

Holmes was arrested on July 11, 2005, and was sentenced on January 19, 2007. She asserts she is entitled to credit for the days up until February 9, 2007, when the court denied her motion to reconsider her sentence and remanded her to state prison. This would give her 579 days of credit.

The Attorney General claims Holmes is entitled to only 558 days of custody credit. He acknowledges the trial court ordered Holmes to remain in custody at the Sacramento County Jail for 30 days pending her attorney's motion to modify the sentence, but he asserts the court had no duty to calculate and apply custody credits after sentencing (§ 2900.5, subd. (d)). The agency to which the defendant was committed must apply the credit for the period between the date of sentencing and the date the person is delivered to the agency. (§ 2900.5, subd. (e).)

 Holmes is ultimately entitled to credit for her jail time between sentencing and delivery to the Department of Corrections and Rehabilitation, but the Attorney General correctly explains how Holmes is to receive credit for that time. Section 2900.5 grants a defendant credit for any period of custody attributable to proceedings related to the same conduct for which she was convicted. (§ 2900.5, subd. (b).) That period includes the time a defendant is in custody between the date of sentencing and the date the defendant is delivered to serve her time of commitment. (§§ 2900, subd. (a), 2900.5, subds. (a), (e).) However, the trial court does not calculate custody credits for that time period. The agency to which the defendant is committed calculates those credits. (§ 2900.5, subds. (d), (e).)

Thus, for purposes of this judgment, Holmes is entitled to 558 days of custody credit, or the time from when she was placed into custody until the date of her sentencing. Any time she remained in custody between the date of

her sentencing and her delivery to the Department of Corrections and Rehabilitation will be calculated and applied to her sentence as custody credit by that department.[10],[11]

## DISPOSITION

The judgments are modified to give Johnson 599 days of custody credit and Holmes 558 days of custody credit pursuant to section 2900.5. The trial court is directed also to correct Holmes's abstract of judgment to indicate the enhancement under section 12022, subdivision (a)(1), is for the term of one year. The trial court is directed to amend the abstracts of judgment accordingly and to forward copies thereof to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

Scotland, P. J., and Robie, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 14, 2010, S182195.

---

[10] Holmes's abstract of judgment also incorrectly states she was sentenced to a determinate term of 25 years for the firearm-arming enhancement (§ 12022, subd. (a)(1)). This is incorrect, as the trial court imposed only a one-year state prison sentence for the enhancement. We order the abstract to be corrected to reflect the correct term on the enhancement.

[11] The recent amendments to section 4019 do not operate to modify defendant's entitlement to credit, as she was committed for a serious felony. (§ 4019, subds. (b)(2) & (c)(2); Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 28, § 50.)