Filed 10/1/21  P. v. Garcia CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B300914 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA107065) |
| v. | |
| JUAN GARCIA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge.  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Juan Castellanos Garcia (defendant) carried a seven-year-old relative out of her home and into an alley where he choked and sexually assaulted her until a passerby stopped him. A jury convicted defendant of kidnapping to commit another crime (child abuse) and several counts of forcible lewd acts upon a child and oral copulation or sexual penetration with a child ten years old or younger. We consider whether the trial court should have suppressed defendant's post-arrest statements to investigators because his low intelligence quotient (IQ) and verbal comprehension skills indicate his waiver of his *Miranda*[1] rights was not knowing and intelligent.

## I. BACKGROUND

### A.   *The Offense Conduct, as Established by the Evidence at Trial*

#### 1.   *Witness testimony*

The victim, Jocelyn, was seven years old at the time of the offense in August 2017. She was nine when she testified at trial. She lived with her mother, father, and siblings in an apartment in Long Beach, California. Defendant is Jocelyn's father's cousin, but she did not recall meeting him before the crimes occurred.

On the evening in question, Jocelyn fell asleep watching television on a couch in the living room of her family's apartment. She woke up to defendant carrying her out of the apartment over his shoulder. She bit and scratched defendant and told him to let her go. Defendant took her to an alley, placed her on her back, and pulled her pants down. Jocelyn testified at trial that she did not recall whether defendant touched her private parts, but she told investigators in an interview conducted the afternoon after

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

the incident (a recording of which was played at trial) that defendant touched her private parts with his hand.

Defendant choked Jocelyn, and she "felt like [she] was about to die." She screamed for help in English and Spanish. Defendant choked her harder and told her to shut up in Spanish. Jocelyn did not lose consciousness, but she felt dizzy and her vision was blurry. She told investigators she pretended to be dead, but she could not recall doing so at trial. Defendant stayed on top of Jocelyn until another man kicked defendant and argued with him in Spanish. Defendant fled when the other man said he was going to call the police. The other man helped Jocelyn back to her family's apartment.

Henry Estuardo Ramirez Lopez (Lopez) was the man who confronted defendant. Lopez testified he was walking to his car around 2:15 a.m. when he heard Jocelyn cry out. Lopez saw defendant on top of Jocelyn, who was attempting to fight him off. Defendant's pants and underwear were pulled down to his knees. Defendant had one hand on Jocelyn's neck and he was moving as if he was having sex. Lopez kicked defendant in the ribs. Defendant rolled over and Lopez saw his exposed and erect penis.

Lopez had a brief conversation with defendant in Spanish. Defendant sounded drunk. Lopez asked who the girl was, and defendant responded she was his friend's daughter. When defendant offered to let Lopez have sex with Jocelyn, Lopez hit him again. Defendant fled, and Lopez helped Jocelyn stand up. Lopez escorted Jocelyn about 200 feet back to her family's apartment. Lopez identified defendant in a six-pack photo array the same day.

Long Beach Police Department officer Alexander Saldana testified that he and other officers found defendant based on

3

information communicated from dispatch regarding defendant's cell phone location. Defendant cooperated with the officers and was taken into custody around 5:40 a.m. (a few hours after the incident). Defendant did not seem intoxicated, and Officer Saldana did not smell alcohol on his breath.

Jennifer Rivera (Rivera), a sexual assault nurse examiner, examined Jocelyn around 4:00 a.m.[2] She documented extensive bruising, a tear to Jocelyn's lip, and pinpoint hemorrhages indicating strangulation. Another nurse, Malinda Wheeler, testified the hemorrhaging observed on Jocelyn would require 10 to 20 seconds of pressure on the neck. Rivera observed debris "all over" Jocelyn's clothing. She also had dirt on her external genitalia. Rivera also observed redness and bruising to Jocelyn's vagina, which she opined was likely caused by "a finger, a penis, or an object."

Rivera collected swabs from various areas of Jocelyn's body and collected reference samples from Jocelyn and defendant. These were analyzed by Anselmo Casas (Casas), a criminalist employed by the Los Angeles County Sheriff's Department. Casas testified that saliva was found on Jocelyn's neck, thighs, vulva, vestibule, and anus. Defendant's DNA was a probabilistic match to samples taken from Jocelyn's umbilicus (belly button), neck, both thighs, and vulva. Jocelyn did not contribute DNA to samples taken from defendant's penis and scrotum.

### 2. *Defendant's recorded police interview*

Long Beach Police Department detective Denise Green and a colleague interviewed defendant about 11 hours after his

---

[2] A follow-up examination was conducted the next day.

4

arrest.[3]  The interview was conducted at a Long Beach Police Department facility.  Detective Green testified she and her colleague are fluent in Spanish and conducted the interview in Spanish.  Detective Green recorded audio of the entire interview and video of parts of the interview.  The recorded audio has a total run-time of about one hour and 12 minutes.  As we shall discuss in more detail, the trial court denied defendant's motion to suppress his statements during the interview, and the recordings were played at trial.

At the beginning of the interview, one of the detectives told defendant they were going to read him his rights and he should let them know if there was anything he did not understand.  The detectives then gave *Miranda* warnings.  Defendant acknowledged the first warning ("you have the right to remain silent") with an "[u]h-huh."  When the detectives completed the warnings and asked defendant whether he understood, defendant responded, "Yeah, yes, but . . . the money, I mean, I, I don't have any."  One of the detectives explained, "what she [i.e. the other detective] means is that if you don't have money for an attorney, the court will assign you an attorney and won't charge you."  Defendant responded, "Oh, okay."  Defendant told the detectives there was nothing else he did not understand and he agreed it would be "okay if we talk."

Defendant told the detectives he was born in Oaxaca, Mexico in 1976.  He had been in the United States less than a year and worked at two restaurants.

Defendant was drinking at Jocelyn's family's apartment the previous evening.  Defendant, his cousin (i.e., Jocelyn's father), and one of his cousin's friends consumed 48 beers (two cases of

---

[3]     During the interview, defendant denied feeling drunk.

24).  This was defendant's second visit to his cousin's home. Defendant initially claimed he could not remember anything other than going to his cousin's apartment to drink, and he professed an inability to recall how he sustained various scratches.

When the detectives showed defendant a photograph of Jocelyn, he said, "I think I did something bad."  Defendant admitted he led Jocelyn outside by the hand because he was not in his right mind after drinking so much.  Defendant confessed to hitting Jocelyn in the face with a closed fist and putting his fingers in her mouth when she screamed for help.  The detectives asked why defendant hit Jocelyn and he said that he wanted to abuse her sexually.  He said he choked her because "lost [his] mind."  The detectives asked defendant what he put in Jocelyn's vagina, telling him they already knew and it was "a question of [defendant] telling [them] what [he] did."  Defendant admitted rubbing Jocelyn's vagina two times and putting his tongue inside.

Defendant maintained that Lopez's intervention prevented him from raping Jocelyn, and the detectives told him (falsely) that semen was found in Jocelyn's vagina.  Defendant indicated he did not know the word "semen"; he said he used the word "milk" to refer to the substance after the detectives explained. Defendant admitted to penetrating Jocelyn's vagina with his penis two times, but said he could only get "the very tip" inside. After making this statement, however, defendant still continued to deny having raped Jocelyn.

The detectives gave defendant materials to write a letter of apology to Jocelyn and her parents, emphasizing that defendant

6

needed to include everything he had told them.[4]  Defendant read the letter he wrote:  "Jocelyn, um, forgive me for the, um, the wrong, wrong I did to you.  I'm sorry and please forgive me, um, for taking you out of the house and, and I'm sorry for hitting you and, and, and taking [you] there in the house.  Um, I'm asking you from the bottom of my heart.  I'm sorry and, and, and forgive me for the wrong that I did and, um, and forgive me cousin for what I did.  I, I regret it.  Forgive me please and forgive me Jocelyn for, for hitting you.  I'm sorry and, and, and Jocelyn, I'm sorry.  Never, never would I do harm to you and forgive me please for everything wrong I did."  Asked what else he did wrong, defendant responded, "trying to rape."  The detectives also asked defendant whether he regretted touching Jocelyn's vagina with his hand, touching her vagina with his mouth, and touching her vagina with his penis; defendant answered "yes" to all.

### B.    Verdict and Sentencing

After presentation of evidence at trial, a jury found defendant guilty on all charged crimes.  Counts one through three of the information against him alleged a forcible lewd act upon a child under the age of 14.  (Pen. Code,[5] § 288, subd. (b)(1).)  Counts four through eight alleged oral copulation or sexual penetration with a child ten years of age or under.  (§ 288.7, subd. (b).)  Count nine alleged kidnapping to commit a lewd and

---

[4]    Detective Green stopped recording while defendant wrote the letter and resumed recording when he finished.

[5]    Undesignated statutory references that follow are to the Penal Code.

lascivious act.  (§ 209, subd. (b)(1).)  Count ten alleged child abuse.  (§ 273a, subd. (a).)

The jury found defendant personally inflicted great bodily injury within the meaning of section 12022.8 as to counts one through eight and within the meaning of section 12022.7, subdivision (a) as to counts nine and ten.  The jury also found true allegations relating to kidnapping a child under the age of 14.[6]

The trial court sentenced defendant to non-consecutive terms of life without the possibility of parole on counts one, two, and three.  The trial court imposed additional, consecutive indeterminate terms for some other offenses of conviction and stayed punishment pursuant to section 654 on the remaining counts; there is no need for our purposes to recount the particulars.

## II.  DISCUSSION

Defendant contends the trial court erred in denying his motion to suppress the police interview because his low IQ and verbal comprehension scores preclude a finding that his *Miranda*

---

[6]     As to count one, the jury found true allegations that defendant kidnapped Jocelyn within the meaning of sections 209 and 667.61, subdivisions (a) and (e), and kidnapped a child under the age of 14 within the meaning of sections 667.61, subdivisions (j)(1) and (d)(2), and 667.8, subdivision (b).  The jury found true the same allegations as to counts two and three, except with respect to section 667.8, subdivision (b) (which was not listed on the verdict form for these counts).  As to counts four through eight, the jury found true the allegation that defendant kidnapped a child under the age of 14 within the meaning of section 667.8, subdivision (b).

waiver was knowing and intelligent. It is well established, however, that the effectiveness of a *Miranda* waiver depends on the totality of the circumstances. The recorded interview provides ample support for the trial court's conclusion that defendant's repeated acknowledgment and waiver of his rights—along with his attempts to minimize his culpability—demonstrate he adequately understood his rights and the consequences of waiver.

### A. Additional Background

Defendant moved to suppress his post-arrest statements to the detectives. He argued he was incapable of making a knowing and intelligent waiver.

At the hearing on defendant's motion, defendant called Dr. Francisco Gomez, a clinical psychologist, to testify. Dr. Gomez explained his "standard forensic evaluation" of defendant's capacity to waive his *Miranda* rights included four parts: a clinical interview, psychological testing, a review of the interview recording, and an assessment for malingering.

During the clinical interview, Dr. Gomez noted defendant never went to school and, having been in the United States only about eight months, was "not really familiar with the system here." Dr. Gomez testified that people with defendant's background "tend to go along with what [authority figures] say and say yes to things." Although Dr. Gomez sometimes had to repeat questions to defendant in a slow manner, "[defendant] pretty much was grasping what [Dr. Gomez] was asking him."

Defendant has an IQ of 61, placing him in the first percentile. Dr. Gomez testified that IQ tests measure verbal ability, nonverbal thinking ability, and processing speed, and

9

"[w]hat really brought down [defendant's] I.Q. is processing speed . . . ." Based on several other tests, Dr. Gomez concluded "[defendant's] ability to process verbal information is slow. . . . So generally when you're explaining something to him, if you just go at a normal pace, he won't pick it up as fast. You'll be on page [three] and he'll still be on page [one]. So you're asking him questions and so he's going to have to—if he doesn't ask you to clarify, he's just going to be answering impulsively." Dr. Gomez further testified that defendant tested at the second grade level for reading and oral comprehension.

Dr. Gomez opined that, given these limitations, defendant was unable to understand his *Miranda* rights when read as "one long string" as opposed to "one . . . at a time." He further stated that, in any case, understanding *Miranda* rights requires at least a seventh grade reading level. Dr. Gomez did not believe defendant's comment about having no money for an attorney demonstrated his understanding of the *Miranda* warnings as a whole because "[t]he one thing [defendants] always pick up is the cost of an attorney." The letter defendant wrote to Jocelyn and her parents during the interview also did not alter Dr. Gomez's opinion because "a second grader, third grader in that range is going to be able to write basic concrete sentences."

The trial court asked Dr. Gomez whether it should "assume that when [defendant] says yes, he does understand [his rights], that he [in fact] doesn't understand[.]" Dr. Gomez responded that "the tendency is, even if you have people with a college education, they tend to say yes to waive their *Miranda*." When the trial court asked Dr. Gomez whether defendant's responses to the detectives' questions throughout the interview were contextually appropriate, Dr. Gomez said he "didn't really focus in on that,"

10

but acknowledged "that [defendant] was denying and then—then he wasn't."

The trial court denied defendant's suppression motion, reasoning as follows: "I . . . want to note that at the beginning of the interview, the detectives did explain to the defendant that if he had any questions, anything he did not understand his rights [*sic*], that let [*sic*] the officers know and they will explain it to him. [¶] In reading through the entire interview, I didn't find anything in that interview that would indicate to me that the defendant could not comprehend questions, many of which were more complicated than the advisement. [¶] There is nothing that led me to believe that he did not understand the questions. [¶] I just—you know, I have all due respect for the doctor but there is nothing in what I heard, nothing in what I read that le[ ]d me to believe that he did not understand his rights and it was not an intelligent and knowing waiver."

### B. Applicable Law and Standard of Review

"'To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of custodial interrogation (*Miranda*, *supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation (*id.* at pp. 444-445).' [Citation.] A suspect who has heard and understood these rights may waive them. [Citations.]" (*People v. Leon* (2020) 8 Cal.5th 831, 842-843 (*Leon*).)

"'[T]he prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing,

intelligent, and voluntary under the totality of the circumstances of the interrogation.' [Citations.]" (*Leon*, *supra*, 8 Cal.5th at 843.) A defendant's waiver is voluntary only if "'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" (*People v. Molano* (2019) 7 Cal.5th 620, 648.) A defendant's waiver is knowing and intelligent only if "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" (*Ibid.*) Relevant considerations include the defendant's age, experience, education, background, and intelligence. (*People v. Johnson* (2010) 183 Cal.App.4th 253, 293.)

Our review of a trial court's ruling on a motion to suppress is limited to the evidence before the court at the time that it ruled. (*People v. Moore* (2006) 39 Cal.4th 168, 171.) "[W]e accept the trial court's factual findings and credibility assessments if supported by substantial evidence. . . . 'Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.' [Citation.]" (*Leon*, *supra*, 8 Cal.5th at 843.)

### C. *Defendant's Waiver Was Knowing and Intelligent*

Our review of the record, and the interview recordings in particular, leave us convinced defendant was capable of understanding and did in fact understand his *Miranda* rights and the consequences of waiving them.

The detectives prefaced the *Miranda* advisement with an invitation for defendant to let them know if he did not understand anything. Then, after reading defendant his rights, the detectives and confirmed his understanding by asking both whether there was anything he did not understand and,

12

affirmatively, whether he understood the *Miranda* warning. In addition, and contrary to Dr. Gomez's characterization or understanding of the *Miranda* advisement as having been given in one uninterrupted stream, there were notable breaks: initially when defendant interjected with "uh-huh" after the advisement that he had the right to remain silent and later when defendant told the detectives he did not understand his right to an appointed attorney and they clarified to defendant's satisfaction the meaning of the right to free representation.

Defendant's statements during the interview attempting to deflect or minimize his culpability provide further reason to conclude he was capable of making, and did make, a knowing and intelligent waiver of rights. Defendant repeatedly emphasized he had been drinking and initially claimed he was unable to remember what he did to Jocelyn. Then he conceded he wanted to sexually abuse Jocelyn, but claimed Lopez prevented him from doing so. These and other statements during the interview that were calculated to minimize his culpability underscore defendant's awareness of the stakes of the interview. (See *Leon*, *supra*, 8 Cal.5th at 844 [holding the defendant's attempt to deceive investigators "indicate[d] attentiveness and an awareness of his circumstances"]; *People v. Lewis* (2001) 26 Cal.4th 334, 384 (*Lewis*) [holding that a 14-year-old, schizophrenic defendant's waiver was knowing and intelligent because, among other things, he was "keen enough to change his story" when confronted with facts contradicting previous statements]; *People v. Whitson* (1998) 17 Cal.4th 229, 249 ["Although [the] defendant possessed relatively low intelligence, he was sufficiently intelligent . . . to attempt to deceive officers"].) Defendant's demeanor during the interview also was not overly deferential in a way that would

13

lend greater credence to Dr. Gomez's belief that defendant's background made him likely to "say yes to things." Defendant did not, for example, concede having touched Jocelyn's buttocks when the detectives falsely suggested his semen was found in that area.

Defendant counters principally by emphasizing a purported inability to understand Spanish as well as his low IQ and verbal skills.

The first of these points is baseless. Although defendant states his first language is a local dialect of Spanish, he did not have any difficulty conversing with the detectives in Spanish. Indeed, Dr. Gomez himself examined defendant in Spanish, and defendant used a Spanish interpreter at trial.[7]

As to the second of these points, defendant cites *Cooper v. Griffin* (5th Cir. 1972) 455 F.2d 1142 (*Cooper*) for the proposition that his IQ score of 61 and his second grade level for reading and oral comprehension made a knowing and intelligent waiver impossible. In *Cooper*, brothers aged 15 and 16 with IQs between 61 and 67 sought habeas relief because their convictions were based on confessions obtained without knowing and intelligent *Miranda* waivers. (*Cooper*, *supra*, at 1143.) Among other things, they presented testimony by a special education teacher who had known them "'practically all their [lives]'" and did not believe they could understand the *Miranda* warnings. (*Ibid.*) The only contrary evidence was the testimony of police officers who stated

---

[7] The exchange in which defendant told the detectives he did not know the meaning of "semen" does not reflect a broader lack of comprehension—to the contrary, this exchange demonstrates his willingness to speak up when he did not understand the detectives.

"each boy appeared to understand the warning." (*Id.* at 1144.) The Fifth Circuit held the petitioners' "*uncontradicted*" evidence left "no alternative but to hold that the waivers by the two boys were not knowingly and intelligently made." (*Ibid.*)

Our Supreme Court has emphasized that *Cooper* is "not controlling precedent" and has repeatedly declined to recognize a minimum IQ or other quantitative metric below which a defendant is incapable of making a knowing and intelligent waiver of *Miranda* rights. (See, e.g., *Leon*, *supra*, 8 Cal.5th at 844 ["We have not decided that any particular intelligence or experience level is required to understand the *Miranda* warnings or to waive them"]; *Lewis*, *supra*, 26 Cal.4th at 384 [""Neither a low I.Q. nor any particular age of minority is a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the *Miranda* explanation was not understood""].) That alone is reason to put *Cooper* to the side as an unreliable guide, but even taking the case on its own terms, the record here is different in a crucial respect. If a recording or transcript of the interrogation was available in *Cooper*, it did not merit a mention in the Fifth Circuit's opinion. Here, on the other hand, we need not rely on police testimony that defendant "appeared" to understand his rights. The recordings in our appellate record demonstrate defendant was actively and intelligently engaged when the detectives read him his rights and throughout the interview.

Defendant suggests that even if controlling case law does not recognize a minimum IQ or verbal comprehension level for a knowing and intelligent waiver, Dr. Gomez's testimony establishes that such a line exists as a matter of scientific fact.

15

That does not square with Supreme Court precedent. In *Leon*, an expert (apparently the same Dr. Gomez who was the defense's expert in this case) testified that "understanding the *Miranda* warnings requires at least seventh grade level reading comprehension." (*Leon*, *supra*, 8 Cal.5th at 841.) Emphasizing that the trial court was "entitled to reject" this testimony, the Supreme Court affirmed the trial court's finding that the defendant's waiver was knowing and intelligent based on its independent review of the videotaped interrogation. (*Id*. at 844-845.)

Furthermore, the trial court's questioning of Dr. Gomez in this case revealed the probative value of his opinion was limited by the fact that he "didn't really focus in on" defendant's responses to the detectives' questions. Like the defendant in *Leon*, defendant was admonished in a language he demonstrably understood, repeatedly and unequivocally waived his rights,[8] and attempted to minimize his culpability during the interview. (*Leon*, *supra*, 8 Cal.5th at 844-845.) Under these circumstances, the trial court's conclusion that defendant's waiver was knowing and intelligent is well supported.

---

[8] We are not persuaded by defendant's suggestion that the use of a printed waiver form was a decisive factor in *Leon*. The defendant contended he "looked at the form only briefly and signed without reading" (*Leon*, *supra*, 8 Cal.5th at 843), and his signature was obtained during an interview that occurred the day before he ultimately confessed (*id*. at 840-841). In any case, the Supreme Court made clear that its ruling was based on its independent review of the recorded police interview. (*Id*. at 844.)

*D.      The Abstract of Judgment Must Be Amended*

Defendant has withdrawn an argument that the abstract of judgment does not accurately reflect his sentence on count ten. There is, however, a different error in the abstract of judgment. In its oral pronouncement of defendant's sentence, the trial court stated defendant's sentences of life without the possibility of parole on counts one through three are "not consecutive to each other." Both the trial court's minute order and the abstract of judgment, however, indicate these sentences are consecutive. Because the oral pronouncement controls (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385), we will order the abstract of judgment amended.

DISPOSITION

The clerk of the superior court shall prepare an amended abstract of judgment indicating defendant's sentences on counts one through three are not consecutive and deliver the amended abstract to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.

18