Filed 7/30/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062920 |
| v. | (Super. Ct. No. 19NF3137) |
| JEFF ANDREW CHRISTENSEN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Affirmed as modified.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Jeff Andrew Christensen was 18 years old when he abducted J.S. (the victim) at gunpoint. He then assisted his boss, a drug dealer, in carrying out acts of violence against the victim to try and extract a $100,000 payment. After being convicted of aggravated kidnapping (Pen. Code, § 209, subd. (a)),[1] Christensen was sentenced to life in prison without the possibility of parole (LWOP).

On appeal, Christensen argues his LWOP sentence is cruel and unusual punishment under the United States and California Constitutions. First, he cites case law holding that the imposition of LWOP sentences on juvenile offenders violates the Eighth Amendment of the United States Constitution. He argues this authority should be extended to 18-year-old offenders. We cannot do so. Christensen's argument has been rejected by both the United States and California Supreme Courts multiple times. Second, Christensen argues his sentence is disproportionate to his culpability under the California Constitution. We disagree. His sentence is proportionate based on his inhumane conduct during the kidnapping and his criminal history.

However, we find the trial court erred by imposing a $300 parole revocation fine on Christensen. He is ineligible for parole, so the fine should not have been imposed. As such, the judgment is modified by striking the $300 parole revocation fine and affirmed as modified

---

[1] Further undesignated statutory references are to the Penal Code.

FACTS AND PROCEDURAL HISTORY

I.

THE KIDNAPPING

The facts underlying Christensen's conviction are undisputed for purposes of this appeal.

The victim was a drug addict who began selling drugs in San Diego County for a dealer named Antonio Silva. Silva was located in Santa Ana and was known as "El Jefe," which is Spanish for the boss. Christensen, who the victim knew as "Reaper," worked for Silva.

The victim did not want to sell drugs for Silva, but he was terrified of Silva, and Silva had threatened to kill the victim if he did not work for him.[2] When the victim first met Silva, Silva took a picture of the victim's identification card, so he knew where the victim and his family lived. In one instance, the victim tried to quit selling drugs for Silva. Silva and some men found the victim, beat him up, and said his family would be killed if he stopped selling drugs.

The record indicates the victim was scheduled to visit Silva on November 17, 2019. The day before this scheduled visit, the victim was robbed of about $4,000 in drugs and $6,000 in cash that belonged to Silva. The next day, the victim received a call from a woman who owed him money for drugs. She told the victim to meet her at a parking lot in El Cajon, and

---

[2] The victim initially began helping his friend, Adrian Bonar, sell drugs. He did not know where Bonar got the drugs from until Bonar introduced him to Silva. Bonar was later killed. His body was found in the trunk of his car. The police determined Bonar was killed at Silva's home, and they suspected Silva was involved in Bonar's murder. Silva forced the victim to sell drugs for him after Bonar was murdered.

she would bring him the owed money and give him a ride to Santa Ana to ostensibly see Silva.

When the victim arrived at the El Cajon parking lot, the woman was not there. Instead, he saw Christensen exit the passenger side of a truck. Christensen told the victim that Silva needed help and asked him to get into the truck. The victim did not want to enter the vehicle, but he feared for his family's safety if he refused to go. Once the victim entered the truck, Christensen pulled out a pistol and pointed it to the victim's side. Christensen then took the victim's cellular phone, turned off location settings, then turned off the phone.

Christensen and another man drove the victim to Santa Ana. They arrived at Silva's home on November 17 at about 5:20 p.m. When the victim entered the home's living room, there was a single plastic chair "surrounded by a bunch of people." Silva directed the victim to sit in the chair. After he sat, Silva told the victim he "had f***ed up" and owed Silva a lot of money. Silva then referenced a prior conversation between them. When the victim first began selling drugs for Silva, Silva had asked the victim how much his life was worth. In the present, Silva asked the victim if he remembered how much he had answered during that conversation. The victim answered, "a hundred thousand dollars." Silva then replied, "that's how much it is going to cost for [you] to get out."

The victim was then brought into the garage. Once inside, he was tied to another plastic chair with duct tape. He testified that there were "a lot of people" in the garage, and some of them were wearing gloves and ski masks. Silva demanded that the victim pay him $100,000. If he did not, Silva threatened to take the victim "to rehab," which the victim interpreted as a death threat. Silva made the victim call his friends and his fiancée to get

4

money while someone sat next to him and pointed a gun at his side. One of the victim's friends was sent a video of the victim tied to the chair.

At some point while he was duct taped to the chair, Silva tried to stick a syringe in the victim that the victim believed contained fentanyl.[3] The victim struggled to avoid the needle, causing the chair to topple over and break. After the chair broke, the men tied the victim to a ladder with duct tape and cords. The ladder was laid horizontally on top of two buckets. The victim was placed face up looking at the ceiling, but his head and neck were off the ladder and completely unsupported. His mouth was covered with duct tape. The victim saw Christensen in the garage while he was being duct taped to the ladder.

After he was tied to the ladder, Silva took a gasoline-soaked rag and placed it over the victim's mouth and nose. Silva repeated this process about 10 to 12 times. At times, the victim could not breathe and blacked out. While he was tied to the ladder, Silva and another man (not Christensen) gave him Gatorade to drink. The victim noticed flakes at the bottom of the drink and tasted fentanyl in it. He thought the men were trying to make him overdose, so he refused to drink. The men ended up pouring the drink onto the victim's body. The victim believed this was done so that his skin would absorb the fentanyl.

Eventually, the victim was able to free one of his arms. He realized he had a lighter in his pocket and used it to burn off his restraints. The duct tape on the victim's head caught fire, burning the left side of his face. Silva came in while the victim was trying to escape. He punched the

---

[3] Police later recovered a syringe containing fentanyl from the crime scene.

victim a few times and had him tied back to the ladder. Other men also came into the garage at various times and would kick the victim and hit him with their fists and the flat side of a machete. They would also use the machete to cut the victim. At one point, someone grabbed the victim by his hair and put a machete to his neck. He then raised the machete to the victim's scalp and threatened "to skin the top of [the victim's] hair off."

At nighttime, Silva's men reinforced the ties to the victim's body. Silva took a gasoline-soaked rag, put it in Silva's mouth, and then put duct tape over it, causing the victim to "swallow[] plenty" of gasoline.

The victim testified that he was mostly imprisoned in the garage. However, he was later taken from the garage and moved to a closet inside the house. Before moving him to the closet, the victim was forced to remove all his clothes except for his underwear. Initially, the men forced the victim to strip naked. They then laughed at him and told him to put his underwear back on. The victim's hands and wrists were bound, and Christensen pushed the victim down the hallway from the garage into the closet. Before the closet door was closed, the victim saw Christensen and another man standing outside the door.

Once the victim was in the closet, Silva said "he was going to take [the victim] to rehab." The victim then heard the sound of a mechanical drill outside the door, which sounded like screws being drilled in. He also heard a gun being racked outside and what he thought was the sound of a gun barrel knocking on the door.

A SWAT team arrived at Silva's home on November 18, 2019, at about 9:20 p.m. (28 hours after the victim's arrival). They breached the home and heard the victim calling for help. They found him locked in a hallway closet. Screws had been inserted through the closet door into the door frame.

6

There were also wooden boards that were screwed into the walls over the closet door that prevented it from being opened.

The victim was taken to the hospital. He had bruising and swelling on his face (including his lips and cheeks). There was redness on his neck, and he had abrasions on his forehead, cheeks, and back. There was significant bruising and redness on his wrists and scrapes and scratches on his arms and torso. The victim also had a maxillary spine fracture. Testing markers indicated that he had been deprived of food and water for roughly 30 hours. Likewise, the victim testified that he was not given any food or drink during his kidnapping (other than the Gatorade mentioned above). Nor was the victim allowed to use the restroom while confined, forcing him to urinate on himself.

At trial, the victim testified that during his kidnapping, Christensen "was just always there. He would help. He would . . . call me names. He would . . . make sure that I [was] complying." "He always had a gun in his hand[]" and pointed it at the victim "[m]any times." Christensen threatened the victim's family, including threats to kill his fiancée and son. Christensen repeatedly punched and kicked the victim, including doing so while Silva held a gasoline rag over the victim's mouth. He also cut the victim's arm with a machete. Surveillance video from Silva's home recorded Christensen at the scene during the victim's captivity. Christensen was 18 years old at the time of the kidnapping.

II.

CONVICTION AND SENTENCING

In 2023, a jury convicted Christensen of kidnapping to get money or something valuable (§ 209, subd. (a)). In committing the kidnapping, it found "he [had] caused bodily harm or intentionally confined the kidnapped

7

person in a way that created a substantial likelihood of death" (§ 209, subd. (a)). It also found that he had used a firearm in committing the crime (§ 12022.53, subd. (b)).

The court imposed a mandatory LWOP sentence on Christensen for the aggravated kidnapping plus 10 years for the gun enhancement.[4] It also imposed a $300 parole revocation fine (§ 1202.45).

During sentencing, the court observed that "[t]he facts of this case showed violence and cruelty." "The victim here was kidnapped. He was beaten. He was tortured. And that . . . was done so . . . [Christensen's] boss, El Jefe, could get money from the victim's friends." The court continued, "[the facts] were disturbing to hear. I have been doing felonies for 20 years, and the facts of this were just worse than just about any case I have tried." The court also expressed its belief that the victim was boarded up in a closet because "he was going to be executed the next day."

On appeal, Christensen contends his LWOP sentence violates the prohibitions on cruel and unusual punishment in the Eighth Amendment of the United States Constitution or article I, section 17 of the California Constitution. Should we affirm his sentence, he asserts the court erred by imposing a $300 parole revocation fine since he is not eligible for parole. We find his sentence is constitutional but agree that the parole revocation fine must be stricken.

---

[4] Section 209, subdivision (a) specifies that "[w]hen a person subjected to [the kidnapping] suffers death or bodily harm, or is intentionally confined in a manner that exposes that person to a substantial likelihood of death, the person, upon conviction, *shall be punished by imprisonment in the state prison for life without possibility of parole*." (Italics added.)

DISCUSSION

"'Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment.'" (*People v. Wilson* (2020) 56 Cal.App.5th 128, 166–167.)

I.

THE EIGHTH AMENDMENT

The Eighth Amendment of the United States "prohibits the infliction of "cruel *and* unusual" punishment.'" (*People v. Baker* (2018) 20 Cal.App.5th 711, 723.) It "does not require strict proportionality between crime and sentence, but rather forbids only extreme sentences that are grossly disproportionate to the crime." (*Harmelin v. Michigan* (1991) 501 U.S. 957, 959.) "'In non-capital cases, the Eighth Amendment encompasses, at most, only a narrow proportionality principle.'" (*United States v. Reynolds* (11th Cir. 2000) 215 F.3d 1210, 1214; *People v. Wilson, supra,* 56 Cal.App.5th at p. 167 ["This proportionality principle is narrow when applied in noncapital cases"].)

Over the last two decades, the United States Supreme Court and California Supreme Court have found that LWOP sentences are unconstitutional as to juvenile offenders. Christensen argues we should extend these cases to find that LWOP sentences are unconstitutional as to 18-year-old offenders. So, we begin by discussing the law governing juvenile LWOP sentences.

"In *Graham v. Florida* (2010) 560 U.S. 48, 82 . . . [(*Graham*)], the Supreme Court found the imposition of a life sentence without parole on a nonhomicide juvenile offender violated the Eighth Amendment. Such a sentence 'is not appropriate in light of a juvenile nonhomicide offender's

9

capacity for change and limited moral culpability.' [Citation.] Two years later, the Supreme Court expanded upon *Graham*. [It] found unconstitutional a mandatory life sentence without parole that was imposed on a juvenile after a homicide conviction. (*Miller v. Alabama* (2012) 567 U.S. 460, 465 . . . [(*Miller*)].) Among other things, the court explained 'children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform . . . , "they are less deserving of the most severe punishments."' [Citation.] A few months after *Miller*, our state Supreme Court found [in *People v. Caballero* (2012) 55 Cal.4th 262, 267–268 (*Caballero*)] a juvenile defendant's 110-year sentence before any chance of parole 'amount[ed] to the functional equivalent of a life without parole sentence,' which violated the principles set forth in *Graham* and *Miller*." (*People v. Howard* (2021) 74 Cal.App.5th 141, 145–146.)

Here, Christensen argues that the brains of 18 year olds, like juveniles, are still developing. (Citing *State v. O'Dell* (2015) 183 Wash.2d 680, 691–692 ["[P]sychological and neurological studies show[] that the "'parts of the brain involved in behavior control'" continue to develop well into a person's 20s"].) Based on this similarity, he contends the holdings of *Graham*, *Miller*, and *Caballero* should be extended to 18-year-old offenders. But the United States Supreme Court and the California Supreme Court have drawn a clear line between juvenile and 18-year-old offenders.

In *Roper v. Simmons* (2005) 543 U.S. 551, 568 (*Roper*), the United States Supreme Court found the Eighth Amendment barred "imposition of the death penalty on juvenile offenders under 18." In doing so, it distinguished between juvenile and 18-year-old offenders. It observed, "[d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish

10

juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. . . . [H]owever, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." (*Id.* at p. 574.)

The California Supreme Court has refused multiple requests to extend *Roper*. For instance, in *People v. Flores* (2020) 9 Cal.5th 371, 429, the defendant argued that *Roper* should be extended to bar imposition of the death penalty on persons 21 years of age or younger. The state Supreme Court declined to do so. It explained, "[d]efendant asks us to expand *Roper* to reach those ages 18 to 21, arguing that research shows that young adults suffer from many of the same cognitive and developmental deficiencies as adolescents. We have previously rejected similar arguments . . . . [Citation.] As we noted in those cases, the high court in *Roper* recognized that the "'qualities that distinguish juveniles from adults do not disappear when an individual turns 18,'" but nonetheless held that the "'age of 18 is the point where society draws the line for many purposes between childhood and adulthood'"and is "'the age at which the line for death eligibility ought to rest.'"" (*Ibid.*; *People v. Powell* (2018) 6 Cal.5th 136, 191–192 [also refusing to extend *Roper* to 18-year-old offenders].)

Similarly, Courts of Appeal have found the Eighth Amendment does not bar imposition of LWOP sentences on 18-year-old offenders. In *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482, the defendant argued his life sentence for murder was unconstitutional. He claimed that "since the crime was committed only five months after [his] 18th birthday the rationale applicable to the sentencing of juveniles should apply to him." (*Ibid.*) The

11

court rejected his argument based on *Roper*. It found, "[m]aking an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [the defendant's] sentence is not cruel and/or unusual under *Graham*, *Miller*, or *Caballero*." (*Ibid*.) Other appellate courts have agreed with *Argeta*. (See, e.g., *People v. Windfield* (2021) 59 Cal.App.5th 496, 525–526; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1030–1032; *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220.)

Christensen argues the above cases are distinguishable because they involved homicides while he was convicted of aggravated kidnapping. But this distinction is unpersuasive. The above cases hold that 18-year-old offenders are treated as adults for sentencing purposes because that is where society has drawn the line between juveniles and adults. The nature of the crime underlying the sentence is immaterial to this reasoning. Since Christensen was 18 years old when he kidnapped the victim, he was rightfully sentenced as an adult. To prevail on his constitutional argument, he would have to show his aggravated kidnapping sentence is unconstitutional for an adult of any age. Christensen has not made that argument.

## II.

### THE CALIFORNIA CONSTITUTION

Christensen also argues his specific sentence is unconstitutional under the California Constitution. We disagree.

12

Unlike the Eighth Amendment that "'prohibits the infliction of "cruel *and* unusual" punishment. . . . Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel *or* unusual" punishment. [Citation.] The distinction in wording is "purposeful and substantive rather than merely semantic. [Citations.]" [Citation.] As a result, we construe the state constitutional provision "separately from its counterpart in the federal Constitution."'" (*People v. Baker*, *supra*, 20 Cal.App.5th at p. 723.)

"[U]nder the California Constitution, a punishment is cruel or unusual 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Wilson*, *supra*, 56 Cal.App.5th at p. 167.) "[E]ven if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense. Such excessive confinement, we have held, violates the cruel or unusual punishment clause [citation] of the California Constitution." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1096.)

Three criteria are used to assess disproportionality: "(1) the nature of the offense and offender, with emphasis on his danger to society; (2) the penalty imposed compared with the penalties for more serious crimes in California; and (3) the punishment for the same offense in other jurisdictions." (*People v. Brewer* (2021) 65 Cal.App.5th 199, 213–214.) "The importance of each of these prongs depends upon the facts of each specific case. [Citation.] Indeed, we may base our decision on the first prong alone." (*People v. Johnson* (2010) 183 Cal.App.4th 253, 297.)

State courts have "uniformly rejected" claims that LWOP sentences for kidnapping while committing bodily harm are cruel or unusual

13

punishment under the California Constitution. (*People v. Castillo* (1991) 233 Cal.App.3d 36, 66.) "'[T]he selection of a proper penalty for a criminal offense is a legislative function involving an appraisal of the evils to be corrected, the weighing of practical alternatives, and consideration of relevant policy factors and responsiveness to the public will.' [Citation.] This broad legislative discretion is subject to constitutional limitation, but given the long-standing, even ancient, horror of kidnapping [citation] and the substantial risk to human life that it presents [citation], we [have] concluded that the punishment is not excessive." (*Ibid.*; *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1236–1237 [rejecting argument that LWOP sentence for aggravated kidnapping violates the California Constitution].)

The circumstances of this case do not warrant a departure from the above authority. Christensen argues his sentence is unconstitutional considering his age and childhood. He points to evidence showing his parents divorced and were imprisoned for felony offenses for parts of his life. He was raised by his grandmother before she died from cancer. After her death, his mother was left to raise seven children alone, and he has no relationship with his father. As the Attorney General's office highlights, though, Christensen felt this mother loved him and did the best she could. He specifically denied that he suffered any type of abuse at home or that he saw any domestic violence. He was never diagnosed with any special education needs and earned good grades in school.

Further, regardless of Christensen's upbringing, the circumstances of his crime were horrific. Indeed, the trial judge stated the facts of this case were the worst he had heard in 20 years of felony trials. Christensen kidnapped the victim at gunpoint, pointed a gun at him multiple times during his captivity, threatened to kill his family, and assisted in his

14

torture.[5] Among other things, Christensen beat the victim while Silva held a gasoline rag over the victim's mouth. He cut the victim's arm with a machete. Christensen also transported the victim to the closet and appeared to help or watch while the closet door was boarded shut. Further, the judge reasonably believed the victim was boarded up in the closet because "he was going to be executed the next day."

The record also shows Christensen has an extensive history of violent behavior. Prior to his arrest, he had been in juvenile hall 22 times since 2013, and he had never been out of custody for more than a month. His first contact with law enforcement occurred when he was 13 years old. Christensen attempted to stab his brother with a kitchen knife. His mother intervened, and Christensen punched her and pulled her hair out. Christensen's family told the police they were scared of him. When Christensen was 15 years old, he was pulled over in a car full of gang members. A loaded gun was found in the car, and one of the gang members told police they were planning to drive to rival gang territory to conduct a drive-by shooting. After this incident, he was arrested multiple times for violating the terms of his probation. Following his arrest for this kidnapping, Christensen participated in multiple assaults of other inmates in jail while he was awaiting trial.

Based on the nature of Christensen's offense and his criminal history, his sentence is not grossly disproportionate to his individual culpability. (See *People v. Johnson, supra,* 183 Cal.App.4th at pp. 296–297.)

---

[5] We use the word "torture" in its common meaning not its legal meaning.

## III.

### PAROLE REVOCATION FINE

Christensen contends the court erred by imposing a $300 parole revocation fine because he is not eligible for parole given his LWOP sentence. The Attorney General's office agrees, as do we. "When there is no parole eligibility, the [parole revocation] fine is clearly not applicable. The statutory language itself is clear, the additional restitution fine is only imposed in a 'case' where a sentence has been imposed which includes a 'period of parole.'" (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.) Since Christensen is not eligible for parole, the fine was erroneously imposed. As such, we modify the judgment to strike the $300 parole revocation fine. (*People v. Callejas* (2000) 85 Cal.App.4th 667, 669.)

### DISPOSITION

The judgment is modified by striking the $300 parole revocation fine that was imposed under section 1202.45. In all other respects, the judgment is affirmed as modified.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


MOTOIKE, J.

16